In re the MARRIAGE OF Steven Michael VRBAN and Mary Jo Vrban.

Upon the Petition of Steven Michael Vrban, Appellant,

And Concerning Mary Jo Vrban, Appellee.

No. 83–1392.

Supreme Court of Iowa.

Dec. 19, 1984.

Gail E. Boliver of Boliver Law Office, Marshalltown, for appellant.

Mark A. Otto of Brierly, McCall, Girdner, Chalupa & McCall, Newton, for appellee.

Considered by UHLENHOPP, P.J., and McGIVERIN, LARSON, SCHULTZ, and WOLLE, JJ.

WOLLE, Justice.

All too often our overburdened trial courts must face and decide difficult issues of child custody, child support and division of marital property which turn almost entirely on credibility of witnesses. This dissolution action was no exception. The trial court heard controverted testimony from expert witnesses as well as the parties and their two young children before granting the wife custody of the children and deciding several contested economic issues. The

court of appeals modified the decree by granting the husband custody and changing several other provisions in the dissolution decree. On further review we vacate the court of appeals decision, modify the decree only with regard to a loan that must be repaid, and otherwise affirm the trial court's decree.

Michael and Mary Jo were married on November 7, 1970. Two children were born to them, Derek on August 12, 1971, and Joslyn on October 10, 1974. Michael had a number of jobs during the marriage and at time of trial was employed as a maintenance engineer earning $1,023.00 net per month. Mary Jo worked at home during the early years of the marriage, but at the time of trial she was working at Wenco Glass Company earning $713.00 net per month.

Michael and Mary Jo first experienced serious difficulties in their marriage in 1977, and by December of 1982 the parties agreed to separate, with Michael moving out of the family home. Mary Jo retained physical custody of the children, with Michael given visitation on alternate weekends. Approximately two months after the separation, however, Mary Jo declined to permit visitation on the ground that Michael had been dating another woman. After a hearing on temporary custody and issuance of a court order, Michael again was able to exercise his visitation rights.

The trial court's decree made permanent this arrangement for Mary Jo to have custody subject to Michael's visitation rights. The trial court ordered Michael to pay monthly child support of $400 and directed that the parties' home be treated as marital property and sold, with the proceeds equally divided after payment of debts. The parties were directed to repay $3,000 they had received from Mary Jo's parents but not about $54,000 they had received from Michael's parents.

The court of appeals substantially modified the decree, switching custody from Mary Jo to Michael, directing that Mary Jo pay child support in an amount to be determined, and providing for repayment to Michael's parents of $10,000 which the parties had used to purchase the lots and some materials for their home. We granted Mary Jo's application for further review.

Given this background, and after reviewing all of the evidence pertinent to each issue, we must determine whether the trial court properly gave custody of the children to Mary Jo and equitably decided the disputed economic issues.

■ No hard and fast rules govern the custody and economic issues in dissolution actions. *In Re Marriage of Bowen*, 219 N.W.2d 683, 687 (Iowa 1974). Because precedent is of little value on those issues, our decision must ultimately depend on the particular facts relevant to each issue. *In Re Marriage of Kehrli*, 241 N.W.2d 923, 926 (Iowa 1976).

■ Our review is de novo because dissolution actions are equitable proceedings, tried in equity. Iowa Code § 598.3 (1983); Iowa R.App.P. 4. Our rule governing review of equity cases provides:

In equity cases, especially when considering the credibility of witnesses, the court gives weight to the fact findings of the trial court, but is not bound by them.

Iowa R.App.P. 14(f)(7). There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding dissolution cases "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." *In Re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974). In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented. *See Lehmkuhl v. Lehmkuhl*, 259 Iowa 686, 692, 145 N.W.2d 456, 460 (1966).

In this case, the testimony of the witnesses—particularly that of Michael and Mary Jo, their minor children, and the expert witnesses—was irreconcilably in conflict on several key issues. In deciding those issues, particularly the question of

child custody, we have relied heavily on the trial court's findings of fact. Those findings were clearly expressed, supported by substantial evidence, and led to a sound and equitable determination of the sensitive issues of child custody, visitation, and child support.

### I. *Custody of the Children.*

General principles applicable to the custody issue are summarized in *In Re Marriage of Bowen*, 219 N.W.2d at 687–88 and *In Re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). All factors there listed bear on the "first and governing consideration," the court's determination of what will be in the long-term best interests of the children. Iowa R.App.P. 14(f)(15).

The trial court sorted out much evidence on this question before deciding that Mary Jo, who like her husband was 32 years of age at time of trial, should have custody of Derek who was then 11 years old and Joslyn who was 8. Its findings of fact clearly indicate which testimony it found most credible. On the smaller questions of who said and did what to bring about unpleasant and disruptive events, and on the larger issues of parenting capability, interest and concern, the trial court found Mary Jo and the witnesses she called more believable than Michael and the witnesses he called.

Mary Jo and Michael gave sharply conflicting accounts concerning several specific incidents which followed their separation. Michael claimed she unreasonably denied him visitation, while Mary Jo attributed the problems to his inappropriate conduct. By downplaying the importance of those incidents and attributing them primarily to the highly stressful breakup of the marriage, the trial court indicated that Mary Jo's description was more lifelike and entitled to greater weight.

More importantly the testimony of Mary Jo, the children, and a psychologist she retained painted a much different broadbrush picture about the character of Michael and his relationship to the children than did the testimony Michael and his psychologist gave. The trial court's findings disclose that her version was more true-to-life and consequently a better guide for determining what custodial arrangement would be in the children's best interests.

Substantial evidence supports the trial court's specific findings of fact on the custody issue. Mary Jo had demonstrated prior to the parties' separation that her parenting skills enabled her to fulfill the role of primary caretaker for the children from the time of their birth. Not only Mary Jo and the psychologists but also the children explained how important their mother was to them. Only she had provided satisfactory assistance for the children's educational and social activities, including such character building activities as Boy Scouts for Derek, Camp Fire Girls for Joslyn, and church activities for both. Mary Jo was accurately pictured as industrious. When the family's financial condition deteriorated, she returned to gainful employment, while also having primary responsibility for care of the children.

The trial court's findings of fact disclose that Michael did not measure up to Mary Jo in maturity or parenting ability. Michael had little concern about financial matters, relying on his parents quite heavily for payment of living expenses even before the parties were married. During the marriage he owned several motorcycles and even took flying lessons at a time when one child had no bed and slept on the floor. He did not hold steady employment and his efforts at self-employment were futile. Michael showed little concern for his family in other ways. He was away from home an average of four nights a week during the marriage. He relied heavily on Mary Jo and his own parents to perform activities he should have engaged in as the father. The evidence fully warrants the trial court's statement that Michael's total record indicated "a lack of maturity as head of a family." His payment of financial obligations was accurately characterized as "dismal." It is also significant that while Mary Jo was loyal to the family and

faithful to her husband until dissolution was decreed, the company Michael kept with another woman triggered many of the stressful problems that arose during the last days of the marriage.

 The court of appeals, in reversing the trial court's custody award, found that Michael would give the children superior care. It relied primarily upon two factors: (1) its finding that Mary Jo had attempted to isolate and alienate the children from their father; and (2) its belief that Mary Jo's intention to move to Colorado where she would work and be near her own family was not in the children's best interest. We share with the court of appeals the recognition that these are both important factors, and we agree that both factors should be given great weight if the evidence establishes they will adversely affect minor children. *See In Re Marriage of Leyda*, 355 N.W.2d 862, 865 (Iowa 1984). We believe those factors here are not sufficient to deprive Mary Jo of custody, however, in view of the trial court's findings based on its assessment of what evidence bearing on these factors was credible.

 The evidence that Mary Jo had alienated Michael from the children was vigorously disputed. Not only did the parties and their expert witnesses disagree about the extent to which there had been attempts to alienate the children from the parents, but the children themselves were dragged into the controversy. They were interviewed by psychologists and a social worker, questioned extensively by the court, and also subjected to questioning by lawyers for both parties. From their testimony the trial court could have concluded that Mary Jo had manipulated them so their testimony would suit her purposes. An entirely different and equally sound reading of the printed testimony, however, is that both parents attempted to influence what the children would say and neither was very successful. From other evidence the trial court found that Michael had in a more subtle manner engaged in a similar campaign against Mary Jo designed to secure the affections of the children. The

trial court could properly find from its interview with the children that they had good reason to prefer living with their mother most of the time.

Another finding of fact deserves mention. Without condoning Mary Jo's actions, the trial court mentioned that Mary Jo did not alone precipitate the disagreement over Michael's exercise of visitation rights. This occurred shortly after the parties' separation and while Michael was dating another woman.

Fortunately, the greater weight of the evidence suggests that the parties' efforts to isolate the children and deprive them of joint parental care have not poisoned their minds or affections. The trial court interviewed both children, and their testimony suggests that they still love and feel close affinity for both parents. Like the trial court, we conclude that Mary Jo should have custody so long as Michael has adequate opportunity for visitation.

With regard to Mary Jo's decision to move to Colorado, we again find the evidence in conflict as to whether such a move will benefit or harmfully uproot the children. In several recent child custody cases, we have discussed the significance of a custodial parent's intent to move to another state. We have noted that stability in the lives of young children can be nurtured as much by leaving them with the person who has been their primary parent figure as by requiring them to live in a neighborhood from which that person has moved. *See, e.g., In Re Marriage of Weidner*, 338 N.W.2d 351, 360–61 (Iowa 1983) (mother's anticipated move out of state with children ought not be barred); *In Re Marriage of Bolin*, 336 N.W.2d 441, 446–47 (Iowa 1983) (move to California by parent with physical care not adverse to child's best interests). Mary Jo did plan carefully for the move, testified openly about her plans, and awaited the trial court's custody determination before moving the children to Colorado.

Considered with all other factors affecting the custody determination, we believe that neither the alleged alienation of the

children nor the anticipated move to Colorado should deprive the children of the opportunity to be raised by the person with greater parental skill and demonstrated concern for their well being.

■ The trial court concluded its decree by emphatically writing:

[T]he evidence is overwhelming in favor of [Mary Jo] to have the care and custody of the two minor children. . . .

Because the evidence the trial court found to be credible supports that determination, we affirm its grant of custody to Mary Jo, subject to Michael's visitation rights. Neither party has asked that the visitation schedule be changed, so Michael shall have the visitation rights set forth in the trial court's decree.

## II. *Child Support.*

■ The trial court ordered that Michael pay Mary Jo $400 each month to support the two children. Michael appealed from that award; and when the court of appeals awarded him custody, it eliminated that provision from the trial court's decree.

That award of child support was fully justified by the disparate earnings and earning capacity of the two parents. Michael was earning about $400 per month more than Mary Jo. The total reqired payment of less than $5000 per year in child support seems modest at best for support of these two school-age children. We affirm the trial court's child support determination.

## III. *Division of Property.*

Because financial difficulties constantly plagued their marriage, Michael and Mary Jo regularly received cash funds from their two sets of parents, Michael's living in Iowa and Mary Jo's living in Colorado. There is no disagreement with regard to the amount or purpose of funds received from Mary Jo's parents; they paid a total of $3000 during the marriage in exchange for a promissory note that both Michael and Mary Jo signed. The trial court properly treated that amount as a loan to both parties and provided in the decree that it

should be repaid from proceeds of sale of the parties' home. The parties agreed that the home should be sold to pay debts because they no longer lived there and expected it would provide sufficient funds for payment of their debts.

The major property-division issue concerned payments Michael and Mary Jo received from Michael's parents. During the marriage Michael's parents provided about $54,000 for various living expenses, the largest portion of which was used to purchase the land and many supplies for building of the home which Michael and·Mary Jo owned in joint tenancy. No promissory notes were given to establish unequivocally that the payments were loans rather than gifts. The parties and Michael's parents gave conflicting testimony about their intent with regard to those payments. Some of the checks had been made payable to Michael; others were made payable to persons who were owed money by Michael and Mary Jo. Significantly, on checks totaling $17,908.10, however, Michael's parents wrote the word "loan" in the "memo" section of each check to describe its purpose.

During the trial Michael contended that all of the payments were loans to the family, just like the payments made by Mary Jo's parents; he urged the trial court to require that the entire amount be repaid from the proceeds of sale of the home before division of any remaining equity. Mary Jo, on the other hand, contended that the entire $54,000 constituted gifts made by Michael's parents to the entire family unit. Under her interpretation, those gifts became marital assets rather than loans that would have to be repaid.

The trial court agreed with the disposition of sale proceeds that Mary Jo requested, but for somewhat different reasons than she presented. After deciding that the $3,000 received from Mary Jo's parents was clearly a loan which must be repaid from sale proceeds, the trial court labeled the payments by Michael's parents "advancements" which did not have to be repaid. In concluding that those payments were "advancements", the trial court cited

*In Re Manatt Trust,* 214 Iowa 432, 239 N.W. 524 (1931). That case held that payments made by a parent to a child are presumed to be advancements that should later be taken into account when the parent's intestate estate is settled; it held that some evidence was required to overcome that presumption. 214 Iowa at 436, 239 N.W. at 526. The *Manatt* case, however, is no longer authoritative on that subject because the Iowa legislature has reversed that presumption. *See* Iowa Code § 633.-224 (1983) (transfer to an heir during lifetime presumed to be an absolute gift rather than advancement, though presumption rebuttable).

The court of appeals modified the trial court's treatment of the payments by Michael's parents, concluding that $10,000 of the total of payments should be repaid to Michael's parents from the proceeds of sale of the home because "$10,000 represented those amounts received from Mike's parents which were directly applied to the cost of the home."

 We disagree both with the trial court and with the court of appeals on this issue. We believe a several-step analysis must be used to determine equitable distribution of funds received from parents. First, the court must determine whether the parties intended that the moneys furnished be repaid. To the extent the funds provided by the parents constituted loans, they must be repaid; if not, they became marital assets subject to equitable distribution in the decree. The court must also determine if funds constituting a gift were given to one party only or to both parties. If only one party received the gift, the court must apply section 598.21(2) (1983) which provides:

> Property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage.

We have held that this statute does not impose an absolute requirement that property received through inheritance or gift be set aside to the donee. *See In Re Marriage of Thomas,* 319 N.W.2d 209, 211 (Iowa 1982). Rather, a court must weigh a variety of factors in determining how such property should be treated, including:

> (1) contributions of the parties toward the property, its care, preservation or improvement;
>
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
>
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
>
> (4) any special needs of either party;
>
> (5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*Id.*

We find inadequate support for the trial court's determination that the entire $54,-000 received from Michael's parents constituted gifts in the nature of advancements with no intent that they be repaid. We also find inadequate support for the court of appeals conclusion that Michael and Mary Jo be required to repay only the funds directly paid toward purchase of the home.

 Considering all of the evidence on this issue, we conclude that the parents performed a significant act each time they wrote the word "loan" on checks amounting to nearly $18,000. The notation on those checks clearly designated the funds transferred by each check to be loans for which the parents expected repayment and which Michael and Mary Jo intended to repay. Conversely, when the parents did not perform the significant act of noting the purpose of funds given by check, the strong suggestion was that the funds constituted gifts. The loans of $3,000 and

$17,908.10 as well as the gifts of nearly $36,000 were made to the family as a unit, not just to Michael. Michael's parents were very concerned throughout the marriage that Mary Jo and the children as well as Michael receive funds adequate for their daily sustenance. Because none of the $54,000 was inherited by or given to only one of the parties, Iowa Code section 598.-21(2) does not apply to the money received from Michael's parents. *See In re Marriage of Wendt*, 339 N.W.2d 615, 616 (Iowa Ct.App.1983).

We modify the decree of the trial court to provide that the loan of $3,000 from Mary Jo's parents and the loan of $17,908.10 from Michael's parents shall be treated alike and repaid from the proceeds of sale of the parties' home. When that indebtedness and other obligations referred to in the decree have been paid, the balance of proceeds from sale of the home shall be divided equally between Michael and Mary Jo.

IV. *Attorney Fees.*

Michael contended in his appeal that the trial court erred in requiring him to pay Mary Jo's attorney fees. The award of attorney fees in a dissolution action depends upon the relative financial circumstances of the parties. *In Re Marriage of Burham*, 283 N.W.2d 269, 278 (Iowa 1979); *In Re Marriage of Fish*, 350 N.W.2d 226, 231 (Iowa Ct.App.1984). The record here adequately supports the trial court's determination that Michael, who had greater earnings and earning capacity than Mary Jo, was better able than her to pay those expenses of this dissolution proceeding along with the taxable court costs.

Neither party shall be required to pay the other party's attorney fees incurred in these appellate proceedings, and the costs of this appeal shall be divided equally between Michael and Mary Jo.

DECISION OF COURT OF APPEALS VACATED; DECREE OF TRIAL COURT MODIFIED AND AFFIRMED.