**IN THE COURT OF APPEALS OF IOWA**

No. 14-0635
Filed February 25, 2015

**JUAN CARLOS GONZALEZ,**
        Plaintiff-Appellant,

**vs.**

**LAINE ALEXANDRA EDWARDS,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Arthur E. Gamble,

Judge.


        Juan Carlos Gonzalez appeals a district court order modifying a paternity

decree to place physical care of a child with the mother, Laine Edwards.

**REVERSED AND REMANDED.**



        Karen A. Taylor of Taylor Law Offices, Des Moines, for appellant.

        Debra Hockett-Clark of Hockett-Clark Law Firm, West Des Moines, for

appellee.


        Considered by Vogel, P.J., and Vaitheswaran and Potterfield, JJ.

**VAITHESWARAN, J.**

Juan Carlos Gonzalez appeals a district court order modifying a paternity decree to place physical care of a child with the mother, Laine Edwards.

## I.  *Background Facts and Proceedings*

Gonzalez and Edwards had a short-term relationship that resulted in the birth of a daughter in 2008.  When the child was approximately seven months old, Gonzalez filed a petition to establish custody, visitation, and child support.  Gonzalez and Edwards stipulated to joint legal custody of the child, with Gonzalez assuming physical care.  Edwards was afforded visitation every other weekend.  Additionally, she was entitled to one optional four-hour visit during the week.  Because she was involved in a physically abusive relationship, the parents stipulated to having the visits at the home of the child's daycare provider, who was Gonzalez's cousin.  While Edwards had the option of choosing her mother's home as the visitation site, she voted against this option because she was not getting along with her mother at the time.

The district court approved the stipulation in early 2010.  Edwards was ordered to pay Gonzalez ten dollars per month in child support.

More than three years later, Edwards petitioned for a modification of the decree.  She alleged Gonzalez failed to provide proper medical treatment for the child, "routinely denied [her] weekday, weekend, holiday and summer visitation," failed to properly supervise the child, and was undocumented.  She also noted she had moved since the entry of the decree.  On the same date, Edwards filed an application for rule to show cause why Gonzalez should not be held in contempt for claimed denials of visitation and medical care.

Following a hearing on the contempt application, the district court found Gonzalez denied Edwards weekend visitation on two specified occasions and denied her weekday visitation on unspecified dates based on Edwards's failure to pay child support. The court further found "Gonzalez did allow visitation to Edwards at times other than the times set forth in the decree." The court nonetheless held Gonzalez in contempt for the denials of visitation. The court also found Gonzalez "in default" on a provision of the stipulated decree requiring him "to keep Edwards apprised of [the child's] medical condition and following recommendations of her medical providers with respect to her condition referred to as 'lazy eye.'" The court ordered Gonzalez to afford Edwards two additional weekend visits and eight additional weekday visits, abide by the visitation provisions of the decree, and "include[ ] Edwards in decisions regarding [the child's] medical care."

Six months after the court entered this order, the district court heard Edwards's application to modify the physical care provision of the decree. Following the hearing, the district court granted the application and Gonzalez appealed. The only issue before us is the propriety of the district court's physical care ruling.

## II.    *Modification of Physical Care*

Once a physical care arrangement is established, courts are empowered to modify the arrangement "only when there has been a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the children." *See Dale v. Pearson*, 555 N.W.2d 243, 245 (Iowa Ct.

App. 1996) (citation omitted). "Additionally, the parent seeking custody must prove an ability to minister more effectively to the children's well-being." *Id.* "This strict standard is premised on the principle that once custody of children has been determined, it should be disturbed only for the most cogent reasons." *Id.* The burden on the non-custodial parent is a heavy one. *See Melchiori v. Kooi*, 644 N.W.2d 365, 368-69 (Iowa Ct. App. 2002). We give weight to the district court's fact findings, especially those addressing the credibility of witnesses, but we are not bound by them. Iowa Ct. R. 6.904(3)(g).

The district court found a substantial change of circumstances based on a variety of factors, including Gonzalez's denial of visitation and his refusal to afford Edwards "equal participation" in decisions affecting the child's welfare.[1] We agree Gonzalez's denial of visitation, as found by the court in its contempt order, constituted a substantial change of circumstances.

The district court next found that the question of whether Edwards could "minister more effectively to the needs of the child [was] a closer question." The court cited several deficiencies in Edwards's lifestyle and parenting abilities but ultimately stated "the determining factor" was Gonzalez's "inability to provide for the medical needs of the child." The court concluded Edwards had "a superior ability to effectively minister to the medical needs of the child" and to "provide for the social, physiological, economic, and educational needs of the child."

---

[1] The district court did not rely on Gonzalez's immigration status in finding a substantial change of circumstances and neither do we because there had been no change in the status from the time the stipulated decree was entered. *See Orantes v. Orantes*, 381 S.W.3d 758, 763 (Ark. 2011).

The court's findings included credibility assessments of both parents. Those assessments heavily favored Edwards over Gonzalez. On appeal, Gonzalez asserts the court was mistaken in placing a negative spin on his testimony. Because the court was able to listen and watch the witnesses and glean nuances in their demeanor which are not apparent in the transcript, we give weight to the credibility findings. *See, e.g., In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984); *In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996). Accordingly, we will not rely on Gonzalez's testimony if it is at odds with Edwards's testimony on the question of who could minister more effectively to the child. We turn to the record on this question, reviewing the record de novo.

At the time of the stipulated decree, Edwards agreed Gonzalez should assume care of the infant child because she was unemployed and living with a physically abusive man—a man she ultimately married. As noted, the court adopted the stipulation.

Gonzalez served as primary caretaker of the child for approximately five years. He moved to Iowa twenty years before the modification hearing, held a steady supervisory position with a construction company, owned a home, and arranged for daycare with his cousin until the child started school. When the child entered kindergarten, she attended a before-and-after-school program and also continued day care with Gonzalez's cousin.

The child shared a close bond with Gonzalez, as confirmed by her kindergarten teacher. She testified the child "usually runs out in the hallways and

jumps into her dad's arms." She also noted the child was "doing wonderful in all academic areas" and she expressed "[n]o" concerns about the child.

The child similarly enjoyed a good relationship with Gonzalez's fiancée, a Columbian education professor who hoped to continue her own education following her marriage to Gonzalez and move to the United States.

From the outset, Gonzalez afforded Edwards's mother weekly visits with the child for at least a day and sometimes two days. Shortly after the paternity decree was entered, Edwards reconciled with her mother and elected to exercise half her visits at her mother's house. Other than the denial of visits summarized in the contempt ruling, she furnished no documentation of having sought and been denied the balance of her visits. At the modification hearing, she conceded the child "doesn't recognize me as an authority figure. As I said before, our bond isn't as what it should be." When asked about the relationship between grandmother and child, she said, "They're really close. They have a strong bond that I wish I had with her." Edwards also conceded that, in the six months after the entry of the contempt order, Gonzalez provided all the visits required by the decree plus more.

Meanwhile, Edwards lived with her abusive husband until mid-2011. While still married to him, she began a short-lived liaison with another man. She did not seek a dissolution of the marriage at any time.

Edwards also showed instability in housing, employment, and financial matters. She lived in six different locations, including her mother's house in 2010 and again as of mid-2013. She held thirteen jobs—many of which she quit before obtaining alternate employment. Three months before the modification

hearing she obtained her most recent job, which paid $4.25 per hour plus tips. Earlier, she quit a job paying close to three times that sum. She had her license suspended twice, the second time just three weeks before the modification hearing. She did not pay the fines that resulted in her second suspension until shortly before the modification hearing. She also failed to pay the ten dollars per month child support obligation for forty months despite regular, albeit changing employment. She only made good on those arrears in 2013, shortly before filing the custody modification application. At the time of the modification hearing, she remained financially dependent on her mother for food, shelter, and the child's extracurricular activities.

We turn to Gonzalez's medical care of the child, which the court found dispositive on the superior care factor. The record reflects the following facts.

In March 2013, the child's grandmother took the child to ophthalmologist, Dr. Clavenna, for an evaluation of her crossed eyes. The grandmother had previously worked for the institution employing Dr. Clavenna. Dr. Clavenna prescribed glasses and a patch for one of the eyes. Gonzalez purchased the glasses.

A month after the first appointment, Dr. Clavenna expressed uncertainty as to whether the child was wearing the patch and glasses. Two months later and just three days before Edwards filed her contempt and modification applications, Dr. Clavenna authored a letter stating treatment required full-time wearing of spectacles and part-time patching. He said there would be permanent vision loss and lack of depth perception, and if the treatment was not implemented, permanent visual loss would occur. By October 2013, he noted

the child was wearing new glasses "full-time." He recommended a patch two to three hours a day "when possible."

The October note followed the father's decision to seek a second opinion from child ophthalmologist Dr. Jean Spencer. Gonzalez testified he wanted to be sure the child still needed glasses. Gonzalez told Dr. Spencer the child wore her glasses four to five hours per day for two months and also patched the left eye for about four hours per day, "but not every day." Dr. Spencer entered the following progress note: The child had "[n]o current glasses. Doing well right now without the glasses." Dr. Spencer confirmed Dr. Clavenna's diagnosis and concluded: "Glasses prescribed for full time wear. Looks to be doing better and hyperopia has decreased so will try now without the bifocal correction. Ongoing follow-up care recommended."

In a deposition, Dr. Spencer provided a detailed explanation of the child's eye conditions. She testified the child had a birth condition known as "accommodative esotropia," manifested by crossing of eyes inward as a result of excessive focusing, and amblyopia, "a vision problem where an eye doesn't see properly, and it's not just explained by glasses." She found the child's eye conditions "had improved with treatment by the time" she saw the child "and it looks like it started quite a bit worse than that when she came in."

In December 2013, Gonzalez, accompanied by Edwards and Edwards's mother, brought the child in for a follow-up examination with Dr. Spencer. Dr. Spencer noted the child was "[w]earing glasses full time. No patching. No new concerns." She observed the following: "Wears the glasses. Still sees some lazy eye. Mom reports went back to Dr. Clavenna—wants to do a bifocal

prescription." She recommended "patching the left eye for 3 to 4 hours per day." Dr. Spencer updated the glasses to a "slightly stronger prescription" and said surgery would be considered if the condition was not well-controlled with glasses. She characterized the child's vision as having "moved up."

In early 2014—just a month before the scheduled modification hearing— Gonzalez, Edwards, and Edwards's mother took the child to another follow-up exam with Dr. Spencer. Edwards and her mother told Dr. Spencer they were insisting on the patch when they had the child; Gonzalez was not. Dr. Spencer observed that the child's eyes would cross "occasionally with the glasses but slight and very brief." She noted there was "[s]till . . . some decreased best corrected acuity in the right eye" compared with the left eye. She recommended continuation with the patching of the left eye four to five hours a day and advised Gonzalez to try a cloth rather than an adhesive patch. She stressed the importance of compliance with treatment. Nonetheless, she found good control with the glasses and determined the child was able to read "the hardest test for trying to test vision."

Significantly, Dr. Spencer's notes from this third visit contained her first and only admonition to comply with treatment. Even more importantly, Dr. Spencer later minimized Gonzalez's noncompliance, testifying by deposition that the "bigger issue" was not the parents' cooperation but "[w]hether the child will cooperate" because, "commonly, children did not like to wear the patch." When asked if the child's vision would get worse in the right eye if she stopped wearing the patch, her response was equivocal at best:

So that's a good question. Up until age seven or eight, some children will slip—what we call slip with their vision where it will start to decrease again. If that happens, we start the patch or the eye drop up again. After age seven or eight, it's typically, for most children, cemented in where even if they favor the other eye, we don't have to patch to maintain the vision anymore. So until age seven or eight, they do require periodic checks on the vision.

She continued:

Now, some children you can patch and get their vision back and stop, and they'll maintain it, and they won't need to patch again. Other children, it will slip and you'll have to start the patching up again. And there's no way to predict who is going to do that, whether [the child] would be in the first group or the second group.

When asked if she knew what would happen if the child stopped wearing her glasses, she responded, "I don't know that we know exactly how to predict what will happen in that circumstance." And when asked if something could be done for a child with inattentive parents who did not do anything until the child reached young adulthood, she responded, "Yeah. I mean, you would do the standard treatment, try glasses and see how it responds and just—determine if glasses are taking care of it or if surgery is indicated." She did not indict Gonzalez for inattention to the child's eye-care needs or at any time suggest his actions or inactions would lead to permanent vision loss.

Dr. Spencer's overall prognosis for the child was positive. She stated the glasses alone "corrected the majority of the esotropia" and helped with the amblyopia "to some degree as well." All that remained was to "work with the patching to try and get the right eye vision the best [they] could." In terms of her plan, she stated,

I would like the vision in her right eye to be better if we can get it there. Some amblyopia never responds completely where you can do all the treatment and the vision may always end up a little short

of the good eye. If we can get it to 20/20 or close to that, that's our goal.

There was no dispute Gonzalez used patches as of the modification hearing. While Edwards criticizes Gonzalez's care, she acknowledged having difficulty obtaining the child's compliance. More importantly, she acknowledged Gonzalez took the child to as many medical appointments as she did and the child's vision improved.

Based on this record, we cannot conclude Gonzalez jeopardized the child's vision. He initiated the contact with the child ophthalmologist, purchased glasses for the child with three different prescriptions, informed Edwards and her mother of follow-up appointments, and took the child to those appointments. At worst, he succumbed to the child's complaints about the patch. However, even with this temporary lapse in judgment, the child's vision improved. The child's eye condition and Gonzalez's response to it were not grounds to modify the five-year physical care arrangement.

The same holds true of Edwards's reliance on the child's periodic vaginal redness and discharge, which all concerned attributed to the child's failure to properly wipe herself. While Edwards and her mother faulted Gonzalez for failing to apply a vaginal cream to the affected area, a nurse practitioner treating the child recommended against its use, stating the child did "not have an abnormality of the perineal area on exam." She continued,

> There is no evidence of infection or reason for medications to be used in this area of the body. The use of medications not recommended by her doctor can lead to further problems such as skin irritation or infection. Please do not apply creams on the vaginal area without supervision from our office.

Significantly, when this condition re-developed later in the year, Gonzalez took the child to a medical provider. There was no indication the condition was serious or life-threatening. At worst, it reflected a failure on the part of Gonzalez, as well as Edwards and her mother, to teach the child proper hygiene practices following urination and defecation.

Edwards also contends Gonzalez ignored a rash near the child's eye, which could have affected her vision. The rash was diagnosed as herpes simplex and a medical note indicated it was already "nearly dry" at the time of the clinic visit. Edwards conceded Gonzalez asked her to come to his house and look at the sore and, together, they went and purchased the required medicine.

On our de novo review, we conclude the child's health conditions and Gonzalez's responses to them did not establish neglect on his part and did not establish Edwards as the superior caretaker. Additionally, the balance of the record showed Gonzalez rather than Edwards to be the superior caretaker.

In reaching this conclusion, we have considered Edwards's present contention that Gonzalez excluded her from key decisions. Edwards testified otherwise at the modification hearing, agreeing Gonzalez repeatedly told her he was interested in having the two of them parent the child together without so much involvement by Edwards's mother. Certainly, there was a period when Gonzalez, frustrated by Edwards's nonpayment of her minimal child support obligation, impermissibly denied her visitation, but the district court dealt with this issue in the contempt order and Gonzalez complied with the order. Accordingly, Gonzalez's improper denial of visits for a limited period of time did not require modification of the physical care provision in the custody decree.

Having found a failure of proof on the "superior care" factor, we reverse the district court's modification of the physical care provision in the stipulated decree. We conclude Gonzalez is entitled to physical care of the child. We remand for further proceedings on the parents' differing visitation plans and for recalculation of child support. Because Edwards was not the prevailing party, we deny her request for appellate attorney fees.

**REVERSED AND REMANDED.**