**IN THE COURT OF APPEALS OF IOWA**

No. 20-1526
Filed December 15, 2021


**IN RE THE MARRIAGE OF MATTHEW W. BROWN
AND SUSAN K. BROWN**

**Upon the Petition of
MATTHEW W. BROWN,**
        Petitioner-Appellee,

**And Concerning
SUSAN K. BROWN,**
        Respondent-Appellant.
_____


        Appeal from the Iowa District Court for Woodbury County, Duane E.

Hoffmeyer, Judge.


        Susan Brown appeals from the dissolution decree establishing spousal

support.  **AFFIRMED.**


        Theodore E. Karpuk, Sioux City, for appellant.

        Anthony L. Osborn and Kecia C. Van't Hof of Gehling Osborn Law Firm,

PLC, Sioux City, for appellee.


        Considered by Tabor, P.J., and Greer J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2021).

**GREER, Judge.**

After an August 2020 dissolution-of-marriage trial, Susan Brown found the award of spousal support to her to be unfairly low. This appeal raises that concern. She and Matthew (Matt) Brown were married in 1991 but separated in July 2019. Unable to resolve their differences, the parties proceeded to a dissolution-of-marriage trial. Considering the length of the marriage, the property division, and the parties' earning capacities, the district court concluded Susan was entitled to traditional alimony of $900 per month for the rest of her life or until she remarries, whichever first occurred. On appeal, she disputes the amount awarded for various reasons. Focused on that award, only Susan appealed the decree.[1]

### Factual Background.

Susan was sixty-three years old at the time of trial, and Matt was sixty-four. Both parties were employed and had been for most of the twenty-nine year marriage, though Matt was the main wage earner of the family. He earned $35 per hour as a mechanic with some overtime.[2] He testified he planned to retire from his job as a mechanic in 2022[3] but would then transition to driving truck. Susan's education included a legal secretary certification from the early 1990s and some training in airline travel, but her work experience involved mostly office work. For

---

[1] The parties also adopted a child, born in 2006. The court awarded the parents joint custody with shared physical care and alternated visitation each week. That arrangement required Matt to pay $106 in monthly child support to Susan. Custody and child support are not at issue in this appeal.

[2] There was some dispute about overtime. Matt suggested he worked more overtime to pay for additional expenses that arose after the parties separated.

[3] There was conflicting testimony about Matt's intended year of retirement. He once referenced the year 2022 but then discussed retiring when the child graduates, which is in 2024.

a few years before the dissolution trial, she worked at a local hotel earning $11.25 per hour, forty hours per week. After reviewing tax records and pay stubs, the district court calculated a 27% difference between the incomes of the parties. On a court-created spreadsheet, gross annual earnings for Matt were set at $87,815 and for Susan at $23,400. On another worksheet, the district court divided the assets of the parties equally so that each party received property valued at $93,345.71. The parties' assets were non-liquid except for some retirement accounts.

At trial, Matt calculated his monthly expenses to be $4523 and Susan detailed monthly expenses of $3355.30. Matt included expenses for their child, while Susan clarified her expenses did not include those necessary to raise the child in her household. She also listed a loan payment associated with the homestead property (for the "garage loan") of $383.98 per month.[4] Susan requested traditional spousal support of $2100 per month for life, and Matt countered with a proposal of $750 monthly for a term of five years.

In the dissolution decree, the district court divided the assets of the parties equally so that each party received property valued at $93,345.71. The court set Matt's gross annual income at $87,815[5] and Susan's gross annual income at

---

[4] Throughout the proceeding, Matt lived in a fifth-wheel camper. The district court ordered the parties to sell their joint homestead, which Susan stayed in during the proceedings. The only debt related to the property was for the "garage loan," which the court split equally between the two parties. Once the house is sold, it was anticipated each party would receive around $61,200. Susan makes a passing request in her brief to retain the home until the child graduates from high school, but we do not consider her undeveloped argument. *See* Iowa R. App. P. 6.903(2)(g)(3).

[5] This was the reported income from the 2019 tax return for Matt. Susan's income from the return was $22,474.

$23,400.[6]  From the gross incomes, the court calculated the parties' monthly adjusted net incomes for child-support purposes.  The court then calculated 27% of the difference between the parties' adjusted net incomes, and the court used this number as a guide along with other factors in awarding Susan $900 per month in traditional spousal support until death or remarriage.  Both parties asked the court to reconsider the award in post-trial filings, but the district court remained steadfast.  Susan claims the district court erred by failing to apply the appropriate factors to calculate her spousal support and by using an incorrect monthly income figure for Matt in that calculation.  She requests a recalculation of spousal support in this appeal to increase the award.[7]

**Standard of Review.**

"Review in equity cases shall be de novo."  Iowa R. App. P. 6.907.  "On appeal, '[w]e give weight to the factual determinations made by the district court; however, their findings are not binding upon [this Court].'"  *In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020) (second alteration in original) (quoting *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015)).

**Analysis.**

A district court has "considerable latitude" in determining what amount to award for spousal support.  *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012).  "Whether to award alimony depends on the peculiar facts of each case."  *Mann*, 943 N.W.2d at 20.  Here, neither party objected to an award of

---

[6] Susan confirmed this amount as "fair and accurate."
[7] If we do adjust the spousal support, Susan contends that any change will require a recalculation of child support on remand.

spousal support; instead, they quarrel over the amount and the term.   Susan

advocates for an award of $2100 per month in spousal support for life.   Our

legislature crafted an approach to the spousal-support analysis by listing various

factors to consider:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> . . . .
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A (2019).  And, our cases give us parameters to consider when

determining which of the three kinds of support to order—traditional, rehabilitative,

or reimbursement.  *See Gust*, 858 N.W.2d at 408 (describing the various types of

spousal support available).   But here, given the twenty-nine-year marriage and

disparity in earnings, we agree with the district court that traditional alimony is

appropriate.   *See id.* at 410–11 ("[M]arriages lasting twenty or more years

commonly cross the durational threshold . . . for traditional spousal support.").

After considering the length of marriage, we note neither party testified to any

health issues.  Both parties are nearing retirement age.  Other than on-job training,

neither has a degree that translates into a newly established career. So we make no changes to the characterization of the spousal support or the term of the payments.

Left with the amount of spousal support to consider, we focus on the earning capabilities of the parties, not necessarily their actual income. *See id.* at 411. Finally, unlike child-support calculations, we have no mathematical formula to apply that determines the amount of spousal support, and each case must be evaluated on the circumstances presented. *See id.* at 411–12. Both parties believed Susan should have some spousal support, but they disagree over how much and for how long.

To begin, Susan contends the district court erred in its analysis of Matt's income in arriving at the spousal-support award and thus, the amount of spousal support, in proportion to Matt's income, is too low. The district court explained its reasoning by noting: "The court believes an award of 27% of the parties' difference in net monthly income is roughly equivalent to the 31% discussed in *Gust* when alimony was deductible and income to the recipient." Yet Susan maintains:

> The Trial Court seriously considered such "reality check"[8] guidelines of [*Gust*], even going to the extent of using a reduced percentage of the differential of incomes (down to 27%) to accommodate the significant recent tax law changes, citing [*Mann*]. However, the Trial Court misstepped at the finish line by applying its *Mann*-reduced percentage to the differential of the parties' *net* incomes vs. their *gross* incomes. 27% x ($5,014.40 less $1,653.74) = $907.38.

---

[8] Susan clarifies that this term relates to our supreme court's application of "nationally developed 'reality check' guidelines to help provide Iowa divorce litigants some level of predictability and consistency in identifying a proper amount of alimony."

The parties debate whether a percentage of the difference in net income or gross income should have been applied in determining the spousal support here. With that in mind, the *Gust* test became less helpful after tax changes in the treatment of spousal support occurred.[9] In *Mann*, our supreme court addressed the change:

> Prior caselaw allocating percentages of income for alimony thus have less economic impact on the payor than the allocation of a similar percentage of income to alimony would have today under current tax law. Thus, by way of example, in *Gust*, we awarded alimony that amounted to 31% of the difference in income between the spouses. If the case were before us today on the same facts, a 31% award would have a larger impact on the payor spouse than in *Gust* because of the tax change.

943 N.W.2d at 21 (citation omitted).

Avoiding any set percentages at the onset, we examine the earning capacities of the parties. First, Susan contends she cannot be self-supporting at the pre-dissolution standard of living on her income alone. She urges the $900 spousal support award cannot get her to that goal either. *See In re Marriage of Hettinga,* 574 N.W.2d 920, 922 (Iowa Ct. App. 1997) ("The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued."). Neither party described the standard of living practiced during the marriage, but the overall financial picture obtained from our review of the property division does not suggest excessive spending. Yet Susan argues Matt was on track to earn $97,412.66 in 2020 and the district court improperly used his 2019 income to calculate the

---

[9] "Under recently enacted federal tax law, alimony payments are no longer tax deductible and are not considered taxable income to the person receiving them." *Mann,* 943 N.W.2d at 21 (citing Tax Cuts and Jobs Act, Pub. L. No. 115–97, § 11051, 131 Stat. 2054, 2089 (2017) (repealing 26 U.S.C. § 215)).

spousal support. Using his last 2020 paystub before trial, Susan calculates that through the end of July, Matt's pay equals gross earnings of $59,946.25 (net earnings of $40,879.99). Using *Gust* and *Mann* as guideposts, Susan requests we apply a 34% factor—which she asserts is actually the "end result percentage in *Gust*"—to the monthly net income of around $5,840 ($40,879 divided by 7), requiring a monthly support award equal of $1985.60. But she points out that even using Matt's claimed net monthly income of $4937, using 34% equates to a monthly spousal support payment of $1678.58. Then Susan contends that based on the district court's ruling related to the homestead (that it be sold now), her monthly expense-to-income shortfall exceeds $2192.93. As she asserts, the request for $2100 per month in spousal support seems fair compared to the $900 awarded because Matt's expenses, as she qualifies them, are below what she calculated as his available income–leaving him an excess of $2500 each month to spend.

While Matt may have earned more in the year 2020, he testified he had a reason for working the extra overtime.[10] The district court "accept[ed] Matt's testimony that he was currently working extra time to cover the expenses associated with two different households. 2019 should be a fair reflection of his base salary and overtime earnings." *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (stating "[t]here is good reason for us to pay very close

---

[10] In a November 2019 temporary order, the district court ordered Matt to maintain health insurance and pay all uncovered medical expenses; all mortgage debt; the full cost of home insurance; the real estate taxes; and one-half of the home's utilities. He was also responsible for all insurance premiums for the family vehicles and all expenses related to the camper, including the debt.

attention to the trial court's assessment of the credibility of witnesses"—because the court listens and watches them in person). Even more, Matt offered he would retire from his job as a mechanic and then work less by driving a truck to make enough to pay the health insurance premiums. Considering the regular wages and overtime before other expenses had to be covered by Matt, it was reasonable for the district court to base his spousal support on the 2019 gross earnings of $87,815. Even after *Gust,* and now considering the teachings of *Mann,* we are still left with no exact mathematical formula to determine alimony. "Where there is a substantial disparity, we do not employ a mathematical formula to determine the amount of spousal support." *Gust*, 858 N.W.2d at 411–12.

Here the district court addressed the tax consequences of the award and examined a comparison of the net difference between the parties' earnings. While the spousal support may be on the lower end of the scale, we cannot say the district court failed to do equity in awarding $900 per month in traditional spousal support until death or remarriage. *See Gust*, 858 N.W.2d at 416 ("We also recognize the trial court was in the best position to balance the parties' needs, and we should intervene on appeal only where there is a failure to do equity.").

**Conclusion.**

We find the district court's determination of the spousal support equitable after considering all factors including the length of marriage, property division, and the earning ability of these parties. We affirm the district court.

**AFFIRMED.**