# IN THE COURT OF APPEALS OF IOWA

No. 23-1159
Filed July 24, 2024

**IN THE MATTER OF THE GUARDIANSHIP OF T.K., L.K., and S.K.,**

**P.K. and D.K.,**
        Appellants,

**T.K., L.K., and S.K., Minor Children,**
        Appellants.
_____

Appeal from the Iowa District Court for Linn County, Angie Johnston, Judge.

Guardians and the protected minor children appeal the termination of a voluntary guardianship after the withdrawal of parental consent. **AFFIRMED.**

Lori L. Klockau of Bray & Klockau, P.L.C., Iowa City, for appellants guardians.

Bryan S. Mugge and Patricia J. Meier of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids, for appellants minor children.

Melody J. Butz of Butz Law Offices, PC, Center Point, for appellee.

Considered by Badding, P.J., Langholz, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**LANGHOLZ, Judge.**

Seven years ago, a young couple agreed to place their three children under the guardianship of the children's paternal grandparents. But after growing concerns about the arrangement, the mother withdrew her consent to the guardianship and filed to terminate it in late 2021. Almost two years later, the district court found that the grandparents and children had failed to prove by clear and convincing evidence that terminating the guardianship would cause rigorous harm to the children as required to continue the guardianship. And so, the court terminated it instead. The grandparents and children now appeal that decision.

This is a tough case. But the grandparents and children bear a heavy burden to continue a voluntary guardianship after a parent withdraws consent. And we recognize that the district court had the "front-row seat to the live testimony," while "our review is limited to reading black words on a white page of a sterile transcript." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). So on our de novo review, we agree with the district court's thoughtful and well-supported decision that the grandparents and children have fallen short of proving by clear and convincing evidence that the guardianship should continue. We thus affirm.

Still, the guardianship's termination is not a rejection of the guardians. Nearly fifty years ago in a similarly difficult case, our supreme court observed that the strong bonds of a successful guardianship can lead to the "paradox that children may become victims of too much love." *In re Burney*, 259 N.W.2d 322, 325 (Iowa 1977). Here too, the children have many relatives who love them on both sides of this case. And so, we hope that all who do—the guardians too—will come together to channel their love to support the children and prevent that fate.

I.

The parents of the children under this guardianship first met in their junior year of high school.[1]  The mother became pregnant with their first child when they were eighteen.  She then moved into the father's home with his parents—the guardians here—and they got married shortly before their daughter was born in 2010.  The family continued to live with the grandparents for most of their marriage.  A second daughter was born about a year later—during the one year they were briefly living in their own apartment.  And four years after that—while back living with the grandparents—they had a son.

The family relationships eventually deteriorated.  The mother moved out of the home—without the children—around Christmas 2015.  And the father moved out shortly after.  The children remained in the care of their grandparents.  In April 2017, the grandparents petitioned to establish a guardianship over the children.  Each parent filed written consents to the guardianship.  The mother explained that she supported creating the guardianship due to her unstable employment and living situation, the grandparents' ability to provide the children health insurance, and their promise to provide the mother open visitation and access to the children.  The grandparents were appointed as guardians in June 2017.  And about a year later, the parents divorced.  Their decree did not address legal custody, physical care, visitation, or child support because the children were under the guardianship.

---

[1] We avoid using the parties' and witnesses' names to respect their privacy because this opinion—unlike the juvenile court's order—is public.  *Compare* Iowa Code § 232.147 (2021), *with id.* §§ 602.4301(2), 602.5110.

The mother soon became concerned about her lack of consistent access to the children. This was a change from her freely available—though not always exercised—access before the guardianship. So in November 2018, the mother made a one-sentence request—without the help of a lawyer—that the court "set visitation times that are regulated and documented through the court." The district court denied the request without a hearing, reasoning that the guardians "have authority regarding matters of visitation" and that the mother did not allege "that the Guardians have failed to act in the [children's] interest[s] or other circumstances necessitating Court intervention." And so the court said the mother "should direct her request for visitation to the Guardians."[2]

The grandmother continued to strictly regulate the time and manner of the mother's visits and interactions with the children—even requiring supervision by one of the grandparents. But the father could see the children whenever he desired. And that disparate regulation appears to have skewed the children's perception of their mother's commitment to parenting. One example of the ongoing conflict between the mother and grandmother was illustrated by a dispute over the mother's delivery of Christmas and birthday gifts to the children. The mother had

---

[2] This decision was made before the enactment of the Iowa Minor Guardianship Proceedings Act, which became effective January 1, 2020. *See* 2019 Iowa Acts ch. 56, §§ 44–45; *see also* Iowa Code § 633.635 (2018) (setting out guardian's previous responsibilities). Under that Act, "[a] guardian should make reasonable efforts to facilitate the continuation of the relationship of the minor and the minor's parents." Iowa Code § 232D.402(4) (2021). And while a "guardian may place reasonable time, place, or manner restrictions on visitation, communication, or interaction between the minor and the minor's parents," the guardian cannot deny "all visitation, communication, or interaction" unless the court finds that the guardian shows "significant physical or emotional harm to the minor has resulted or is likely to result to the minor from parental contact." *Id.* § 232D.401(5).

purchased many gifts for the children and those gifts were never delivered. The mother claimed that she was unable to deliver the gifts to the children because of the restrictions the grandmother put on when and where they could be delivered. Then, the mother did not give the gifts to the children on the few times she was permitted to visit because she did not want the children to think she was trying to buy their love with gifts.

The tensions between the parties continued to ratchet tighter with time. In February 2019, the two daughters began attending therapy with a mental-health counselor. The counselor testified that the grandmother was present during "99 percent" of the girls' therapy sessions and that the girls attended sessions together. The counselor testified that the youngest daughter became "less bright" and was somewhat withdrawn beginning in October 2021, which the counselor attributed to the mother's efforts to terminate the guardianship—although she could not explain what statements the daughters made to cause her to come to that conclusion. And that daughter engaged in self-harming behaviors—such as pulling out eyelashes and tooth fillings—and reported suicidal thoughts that got worse as the mother sought to have more visitation and terminate the guardianship.

The mother applied to terminate the guardianship in October 2021. The grandparents and the children resisted termination.[3] The father also preferred that the guardianship continue unchanged. After months of litigation, the parties

---

[3] The children were appointed an attorney to represent them in the proceeding. *See* Iowa Code § 232D.303(2) ("An attorney representing the minor shall advocate for the wishes of the minor to the extent that those wishes are reasonably ascertainable and advocate for best interest of the minor if the wishes of the minor are not reasonably ascertainable.").

reached a visitation agreement in March 2022. Under the agreement, the daughters and mother were to attend family therapy sessions together. The family therapist saw progress in the initial sessions between the mother and daughters. But the daughters stopped attending because—according to the grandmother—they were frustrated with the family therapist and believed their opinions were not being considered. And then, in July 2022, the mother renewed her request to terminate the guardianship because she claimed the guardians were not complying with the visitation agreement.

As the case progressed, accusations about the mother and the grandparents were made to, and investigated by, the Iowa Department of Health and Human Services ("HHS").[4] The mother made two reports against the grandparents. And the children's mental-health counselor made two reports about the mother. We need not dwell and permanently memorialize the specific allegations—they were all determined by HHS to be unfounded. The HHS worker who investigated the most serious of the accusations against the mother testified at trial that the allegations "didn't really add up" and she believed the daughter had been coached to make certain statements. And when given the chance, the Linn County Attorney declined to initiate a child-in-need-of-assistance proceeding for the children.

By trial, the mother had remarried and had one son with her new husband. The mother and her new husband were separated at that time, but she testified that they have a good relationship. The mother was employed and lived in a four-

---

[4] We refer to HHS by its name at the time of trial rather than the time of reporting.

bedroom apartment. The father had also remarried, had two children with his current wife, and adopted his wife's child from a prior relationship. And he testified that he would seek to obtain custody of the three children if the court terminated the guardianship.

Over a two-day bench trial in May 2023, the district court heard testimony from twelve witnesses—including the children's parents and grandparents, the HHS workers who investigated the dueling reports, and the girls' mental-health counselor. The court also conducted an "in camera interview" of the two girls.[5] And in addition to the evidence received from parties, the court visitor recommended that the court terminate the guardianship.[6]

Consistent with that recommendation, the court terminated the guardianship in July 2023. In a thorough decision, the court reasoned that the grandparents and children had "not reached the burden of showing rigorous harm will result to the children by termination of the guardianship" as required to continue the guardianship once the mother withdrew her consent. The grandparents and children now appeal.

---

[5] While the district court decision refers to its in-camera interview with the girls, we see nothing in the record to suggest that the interview was recorded or reported. Our supreme court has repeatedly "disapproved the absence of record of such interviews" because "[w]ithout a record of the judge's interviews, we do not have the same information as the trial judge and our review is hindered." *In re Marriage of McFarland*, 239 N.W.2d 175, 178 (Iowa 1975). And so, we decide this appeal "without regard to any trial court findings premised upon the unreported interviews." *Id.*

[6] Among other duties, a court-appointed court visitor must, after conducting appropriate investigation, submit a written "recommendation regarding the appropriateness of a guardianship for the minor" and any other matters relevant to "the best interests of the minor." Iowa Code § 232D.305(4).

II.

Under the Iowa Minor Guardianship Proceeding Act, the court "shall terminate a guardianship established" with parental consent:

> if the court finds that the basis for the guardianship set forth in section 232D.203 is not currently satisfied unless the court finds that the termination of the guardianship would be harmful to the minor and the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship.

Iowa Code § 232D.503(2).

Once a parent revokes her consent, the statutory basis for the guardianship no longer exists. *See In re Guardianship of L.Y.*, 968 N.W.2d 882, 894 (Iowa 2022); *see also* Iowa Code § 232D.203(1) (requiring, among other things, any parent with legal custody to "knowingly and voluntarily consent to the guardianship"). And so, the court must then terminate the guardianship unless it finds that doing so "would be harmful to the minor" and the balance of the minor's and parent's interests weighs in favor of continuing the guardianship. Iowa Code § 232D.503(2).

In considering this second step of the analysis, the "court must start with the rebuttable presumption that the [children's] best interests are served by reuniting the minor child with their parent." *L.Y.*, 968 N.W.2d at 899–900. And a guardian seeking to continue the guardianship then "bears the burden of rebutting this presumption by clear and convincing evidence that" termination would result in "a real threat" of "either physical harm or significant, long-term emotional harm." *Id.* at 900.

Unlike a typical child-custody dispute between parents, under this "rigorous harm standard," it is not enough "for the guardians to show that they would provide superior care to the child[ren]." *Id.* Nor do "economic and cultural advantages in the guardians' home" or "more extracurricular activities" "tip the balance in their favor." *Id.* at 900–01 (cleaned up). And the children's "anxiety over the transition from one home to another does not rise to the level of significant emotional harm" because we recognize that "[n]o matter how cases like this one are resolved, there will likely be anxiety and stress for the child[ren] for a period of time." *Id.* at 901.

Still, the presumption in favor of reunification can be rebutted with evidence of "the parent's present unfitness or past abandonment of the child[ren] such that the affections of the child[ren] and [guardian] have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child[ren]." *Id.* (cleaned up). Even so, "it is particularly inappropriate to focus solely on a parent's failure to discharge the duties of parental care and protection" since "guardianships are designed to temporarily relieve parents of the rigors of raising [children]." *Id.* at 900 (cleaned up). Because we want to encourage—not discourage—parents to voluntarily establish a guardianship when needed, we must take care not to hold their doing so against them. *See id.*

We review the district court's decision to terminate a guardianship de novo. *See id.* at 892. We are not bound by the court's factual findings. *Id.* But "we give them weight and defer especially where the credibility of witnesses is a factor in the outcome." *Hora*, 5 N.W.3d at 645 (cleaned up); *see also* Iowa R. App. P. 6.904(3)(g). We do so for "pragmatic" reasons because the district court "view[s] the demeanor of both the witness as she testifies and the parties while

they listen." *Hora*, 5 N.W.3d at 645. And thus, the district court "is in a far better position to pass upon their credibility than is this court." *Id.* (cleaned up); *see also In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (noting the district court "is greatly helped in making a wise decision about the parties by listening to them and watching them in person" (cleaned up)).

The grandparents and children mainly argue that they met their burden to show rigorous harm with the testimony of the girls' mental-health counselor that they would suffer emotional harm, especially the younger daughter's self-harming behaviors. And true, the mental-health counselor opined at trial that the potential harm to the children would be grave—"probably a 10" "on a scale of 1 to 10." But the district court discounted this opinion because of concerns about the counselor's objectivity and the other contradictory evidence.[7] Giving deference to district court's witness-credibility assessments, we agree with the court's finding that the record lacks clear and convincing evidence of "physical harm or significant, long-term emotional harm." *L.Y.*, 968 N.W.2d at 900.

Indeed, it is hard to square the mental-health counselor's testimony with the other evidence provided at trial. Her accusations against the mother were determined to be unfounded. A family therapist—who unlike the girls' counselor actually saw them together with the mother—did not share the counselor's concerns and reported to HHS that she had not observed the youngest daughter

---

[7] The court based its objectivity concerns in part on the testimony of one of the HHS workers who investigated the counselor's reports and said that the counselor had a "very negative perception" of the mother. The court also found it concerning that the girls had therapy together with their grandmother and thus "were not given a safe space to process their feelings about their mother with an impartial third party."

to be anxious around her mother, despite the grandmother claiming that the youngest daughter's anxiety made it necessary to discontinue the therapy sessions.

The district court acknowledged that the youngest daughter's self-harming behaviors and suicidal ideation presented the closest call for a finding of a real threat of rigorous harm. But we agree with the court's finding that such potential harm could not be attributed to termination of the guardianship. There is conflicting information about when the behavior started and for what reason:

> It is possible that the behavior was related to the conflict [the youngest daughter] had in wanting to have a relationship with her mother and not wanting to disappoint her grandmother. Or it is possible it was that she was conflicted because she wanted to have a relationship with her mother but was being told by [the oldest daughter] (who is a much stronger personality) that their mother is a liar and a bad person who does not take care of them. It is hard to say how much of [the oldest daughter]'s statements on these matters are her own feelings or the things that her grandmother has told her, coupled with her strong loyalty to her grandmother.

The tensions between the mother and grandmother have contributed to a breakdown in trust between the mother and the children, and the youngest daughter's recent behavior reveals that. But the grandmother unilaterally chose to end the family therapy between the daughters and the mother and has broadly resisted rehabilitating the relationship.

The likelihood of rigorous harm is further reduced given the mother's testimony that she would be willing to engage in whatever transition planning is necessary to lessen the trauma of termination of the guardianship. She also expressed a desire to keep the grandparents in the children's lives. And she showed a willingness to engage in therapy and, based on the report from the family

therapist, therapy between the mother and daughters would be beneficial in lessening whatever anxiety the children may experience because of the guardianship's termination. We are also mindful that the children have two fit parents and since custody matters were left unaddressed in the original dissolution decree, termination of the guardianship does not necessarily mean that the mother will have legal custody or physical care of the children. Indeed, the father testified that he would seek to have sole physical care of the children if the guardianship ended. In sum, we do not see clear and convincing evidence of rigorous harm.

The grandparents and children also argue that they rebutted the presumption in favor of reunification by showing the mother abandoned the children.[8] But the record does not support this contention. The guardians claim that the lack of visits by the mother for "weeks or months at a time" combined with her abstinence from participating in regular parental duties qualified as abandonment. The instances the guardians refer to as abandonment include testimony in which the mother claimed to attempt to visit the children but was prevented from doing so by the grandmother, as well as the mother's testimony confirming she did not deliver several gifts. And the mother's failure to discharge regular parental duties here is not considered an action of abandonment under Iowa law. *See L.Y.*, 968 N.W.2d at 900. The record includes many times when the grandmother denied the mother visits with the children. The mother has diligently pursued termination of the guardianship for years and renewed her

---

[8] They also briefly contend that the mother is unfit to care for the children but do not separately analyze the facts in support of this contention, seeming to rely on the alleged abandonment to support it too. Like the district court, we see no clear and convincing evidence that the mother is unfit either.

request to terminate the guardianship because of the grandmother's alleged failure to abide by a mediated visitation agreement. We thus agree with the district court's finding that the mother has not abandoned the children.

"[I]t is not unusual for Iowa's courts to remove children from conscientious, well-intentioned custodians with a history of providing good care to the children and place them with a natural parent." *Id.* at 895–96 (cleaned up). We do so again here because that is what the law requires. Since the mother withdrew her consent to this voluntary guardianship and there is not clear and convincing evidence that termination will result in rigorous harm to the children, we agree that the district court properly terminated the guardianship.

**AFFIRMED.**