# IN THE COURT OF APPEALS OF IOWA

No. 15-0973
Filed February 10, 2016

IN RE THE MARRIAGE OF MISTY DAWN TUCKER
AND NICHOLAS DAVID TUCKER

Upon the Petition of
MISTY DAWN TUCKER, n/k/a
MISTY DAWN STUART,
    Petitioner-Appellee/Cross-Appellant,

And Concerning
NICHOLAS DAVID TUCKER,
    Respondent-Appellant/Cross-Appellee.
_____

    Appeal from the Iowa District Court for Mahaska County, Daniel P. Wilson, Judge.

    A father appeals the district court's grant of physical care of the parties' two children to the mother, and the mother cross-appeals. **AFFIRMED ON APPEAL; MODIFIED ON CROSS-APPEAL.**

    Diane Crookham-Johnson of Crookham-Johnson Law Office, P.L.L.C., Oskaloosa, and Philip J. De Koster of De Koster & De Koster, P.L.L.C., Hull, for appellant/cross-appellee.

    Heidi Young of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry, Brown & Bergmann, L.L.P., Des Moines, for appellee/cross-appellant.

    Heard by Tabor, P.J., and Bower and McDonald, JJ.

**BOWER, Judge.**

The May 2015 dissolution decree entered for Nicholas and Misty Tucker[1] provided they would have joint legal custody and Misty would provide the physical care for their two children. Nicholas appeals and seeks physical care. Misty cross-appeals and challenges Nicholas's receipt of (1) both children's tax exemptions and (2) a child-support offset based on one child's supplemental security income (SSI). Because we agree with the court's determination the children's best interests will be served by continuing physical care with their historical caregiver, Misty, we affirm the court's ruling on physical care. On Misty's cross-appeal, we modify the court's ruling so that each parent claims one child for a dependency tax exemption. We also modify the court's ruling on child support by striking the offset to Nicholas's support obligation.

**I. Background Facts and Proceedings**

Misty and Nicholas, both in their thirties, started dating in 2002 and were married in 2005. They are the parents of H.T., age nine and one-half, and K.T., age five and one-half. The children have a close sibling relationship. K.T. was born deaf and underwent cochlear implant surgery on one ear in 2011, age three years and three months, and on the other ear in 2013, age four years and eight months. K.T. is able to hear when he wears the cochlear-implant devices (CIs).[2]

---

[1] Misty is now using her maiden name and is known as Misty Stuart.

[2] Nicholas described the CIs:

> The [outside piece] has the battery, the processor, cable, and the head piece. We've had a lot of trouble with the cables when he's had issues at school, things like that. That's typically because it's a regular wire so it gets damaged very easily. And sometimes we've had issues with a

If K.T. is not wearing the CIs, he cannot hear and uses sign language. Both Nicholas and Misty can communicate with K.T. using sign language. Nicholas testified he is able to use sign language to "calm [K.T.] down and give him that sense of communication with him enough to calm him down." Misty has three relatives who are profoundly deaf, and she works with them on developing her own skills in sign language.

Shortly after K.T.'s first surgery in 2011, Misty took him to see speech therapist Kim Swartz; those appointments are ongoing. It is undisputed, based on K.T.'s age when he received the implants, he is developmentally on track. He currently communicates at approximately a two-year-old level because he has had access to sound in order to learn and develop speech and language skills for two years. K.T.'s communication skills are expected to "catch up to" his hearing-age peers at age nine or ten. K.T. has no I.Q. issues, and professionals opine he will be successful in a general-education classroom if his communication skills continue to improve. Nicholas testified the teachers who have worked with K.T. have all "said he's a very bright, happy kid."

For three years, K.T. has attended day care and then preschool at Eddyville schools. Both parents attend K.T.'s conferences and his annual individual education plan (IEP) meetings. In the classroom, K.T. has had frequent and sometimes violent outbursts. About six weeks before the April 2015

---

couple processors that just weren't working for some reason, probably got jarred or something from being thrown, and I've had trouble with the ear hooks as well because of their design. There's a weak spot that they've been broken several times.

dissolution trial, K.T.'s long-term medical care provider placed him on medication for attention deficit hyperactivity disorder (ADHD). Misty believes the medication has been decreasing K.T.'s "acting out" behaviors—he is not "throwing and hitting things now." Nicholas testified K.T.'s behavior has "gotten better since he's been on the medicine" but his behavior is still problematic if his wearing of the CIs is "inconsistent." Nicholas does not believe K.T. should be medicated and is concerned about K.T. being labeled a problem child.

The parties separated, and Misty and the children started living with her parents in November 2013. When Misty moved out, Nicholas was working in Cedar Rapids and saw the children about once a week. Misty was frustrated that Nicholas did not see the children more often on the days he was not working. From November 2013 to May 2014, Misty took care of the children, and Nicholas occasionally watched them but provided no financial support to Misty.

In May of 2014, Nicholas took a new job in a new location. He then would call Misty and tell her the days and nights he would be taking the kids based on the days he had off from work; again, there was no regular schedule. Nicholas would pull the children out of daycare on his days off. Misty paid the daycare bills despite Nicholas's agreement to pay half.

Nicholas currently lives with his girlfriend, Tanya, and one of Tanya's three children in the two-bedroom marital home. Nicholas and Misty had been buying the house on contract, and the owners forfeited the contract for nonpayment. Nicholas now pays rent to the same owners and believes there is a possibility he could again contract to buy the home.

Misty and Nicholas both drank during their relationship, and Misty has had issues with alcohol abuse. At trial Misty stated she had one a drink on January 1, 2015, and prior to that she had a drink on July 26, 2014. When the parties were together, Misty observed Nicholas being violent when he was drinking. Nicholas testified his drinking has "gone in spurts" and the heaviest drinking he has done since the children were born was no more than six beers at night for "maybe five or six days in a month."

After Nicolas and Misty separated, on two occasions Nicholas and Tanya used Tanya's brother, Tony Jr., as a babysitter, and the children spent the night at his house. According to Nicholas, both overnights occurred before the family learned of Tony Jr.'s pending criminal charges for third-degree sexual abuse of a young, female teenager. At trial, Misty expressed concern about Tony Jr. being around H.T. The children's guardian ad litem also expressed concerns in this regard. Nicholas testified the children have not stayed with Tony Jr. after the charges and the only post-charge occasion in which H.T. was at Tony Jr.'s house was when H.T. got her hair done for a dance. On that occasion, Tony Jr. and Nicholas remained outside the house the whole time.

Misty testified she began abusing prescription medications after she was sexually assaulted in 2011 and also testified she has been sober from narcotic abuse since July 2012 (approximately three years before the April 2015 trial). She regularly attends NA/AA meetings and has a sponsor. Misty smokes cigarettes in her bedroom at home and in the car.

In June and July 2014, Misty's parents were out of town. Due to her work schedule, Misty asked Nicholas for more help with the children. During those months, the children were with Nicholas more than half the time. Also in July 2014, Misty and the children moved to a separate residence in which the children have their own bedrooms.

Misty filed for dissolution in August 2014. After the parties attended mediation, a stipulated order on temporary matters was filed in October 2014. Under the temporary order, the parties shared legal and physical custody, and no child support was paid.

In November 2014, Nicholas started taking K.T. to Lindsey Overton at Chatterbox Speech "at least once a week." Overton would work with both K.T. and Nicholas and would put homework for K.T. on the post-session paperwork. Nicholas did not tell Misty about the appointments or the homework. Overton testified Misty was not made aware of these weekly appointments until January 2015 or later. Overton observed Misty is receptive to Overton's coaching—Misty was willing to do charts for K.T. and was "on board" with Overton's "plan." Misty and K.T. met with Overton three times. Overton testified, based on her numerous sessions with Nicholas and K.T. and her three sessions with Misty and K.T., Nicholas is "on track" as a parent regarding commitment to CIs while Misty is "trying" but K.T. refuses to wear the CIs with her. Overton admitted she provided Nicholas with more information than she provided to Misty. While Overton believed K.T.'s development was on track, she did not believe it was

appropriate to take off K.T.'s CIs when he was in the car, or was angry and frustrated, or was having bad behavior. Overton clarified:

> [I]f we're taking the [CI's] off but we're providing [signs or sign language or picture visuals,] I guess that's an approach to take. It wouldn't be one I would want to take, but it's an approach that could work. I would guess that the reason they would be taken off is to keep them from being broken . . . . I'm not sure why he's learned that if he's mad or angry, the way to respond is to do something to his [CIs]. But he has.

Sarah Welch is the "deaf and hard of hearing" teacher at K.T.'s school and has worked with K.T. for three years—five one-half days each week. Welch testified, if K.T. has the CIs on he does not "take them off unless there's a behavior issue. And then, that's kind of his go to thing. He takes them off and throws them." Welch explained the school's efforts to close K.T.'s language gap "and getting his language built so he can understand instruction" in a general education classroom: "It is a combination between the CIs, which help with auditory, oral skills, and also maintaining his sign language so that he has a mode of communication, whether it's going to be oral or it's going to be sign language."

Welch observed the CIs are "typically on" when Nicholas brings K.T. to school. When Misty brings him to school, "sometimes they're on. But usually they're either in his backpack or she gives them to K.T.'s associate." Welch will then offer K.T. the CIs, and she described her typical procedure: "[W]hen his behaviors have gotten bad this year, I get them out and I offer them to him and he doesn't always put them on. But I don't struggle with him because they have been broken so many times. So then I just put them back on my desk."

Welch believed K.T. "does better behaviorally" and is "easier to redirect" when he is wearing the CIs. On bad-behavior days, K.T. yells and screams, and "in the past," he has hit or thrown things at adults. After the school principal calls for one of K.T.'s parents to come to his classroom, Welch has observed both parents are able to calm K.T. with the CIs off. Welch can also calm K.T. with the CIs off. Welch explained K.T.'s behavior issues and frustrations "stem from his lack of communication" in both forms—sign and auditory. "So he's frustrated because he can't express what he wants or needs. So no, I can't say that it's from one or the other [parent]."

Sometimes when K.T. is acting out, Welch removes him to a less-stimulating area, where K.T. typically throws his shoes off and also throws his CIs off. Because K.T. has tended to break the CIs, Welch sometimes will remove the CIs "before [K.T.] has a chance to take them off and throw them." K.T. usually calms himself down, is returned to the classroom, and Welch offers him the CIs. Sometimes K.T. puts them back on, and sometimes he does not.

Misty believes the children have more of a daily routine at her household than they do at Nicholas's household. Misty testified her form of discipline is to take away toys or television time or to have a time out and she does not spank the children, while Nicholas used spanking as a discipline technique. Nicholas testified he had been "spanked as a kid and I believe it gave me a better knowledge of what's right from wrong . . . . And at first I thought maybe it was right [to spank] but I kind of changed my mode and did more grounding things

and taking away items." Nicholas testified he had not used spanking as punishment for four years.[3]

It is undisputed the parties have had numerous disagreements about the children's medical care and the appropriate treatment. For example, Nicholas was unhappy when K.T. was recently prescribed the ADHD medication. Misty stated she consistently provided Nicholas with notice of all the children's appointments and set up appointments on the days Nicholas is off work. However, Nicholas refused to do the same for her, and if he did tell her, it was untimely. Misty's testimony is supported by Nicholas's actions of failing to inform Misty when, three months after Misty filed for dissolution, Nicholas started taking K.T. to an entirely new speech therapist. In this regard, the record demonstrates Misty is the parent seeking to keep Nicholas up to date on the children's appointments and activities while Nicholas has chosen not to extend the same courtesy to Misty.[4]

---

[3] Misty reported Nicholas to the Iowa Department of Human Services (DHS) based on bruising she found on K.T. After an investigation, the report's conclusion was "not founded." Nicholas testified the DHS worker "gave me an order . . . stating no aggression toward the children, specifically [K.T.]."

[4] At trial, Nicholas presented a letter from an audiologist at the University of Iowa ("it is crucial for K to use his [CIs] on a full time basis") and from teacher Welch (on the days K comes to school without his CIs on, "[t]hese days are very difficult for him and his behavior reflects this"). On cross-examination, Nicholas admitted Misty was not given either letter and also admitted it is important that Misty be included in this type of information. To justify his failure to give Misty the audiologist's letter, Nicholas claimed the audiologist's information is "something that's been spoken of since he got [the CIs] to begin with." To justify his failure to give Misty the letter from teacher Welch, Nicholas claimed he spoke with Misty about the information "prior to this letter." Nicholas's behavior demonstrates gamesmanship during the dissolution process instead of the preferable process of working with Misty to jointly provide the best care for their children.

Five weeks before trial, Nicholas and Misty both took K.T. to his initial appointment with a play therapist in Ottumwa. Thereafter, Nicholas has not followed up with making his own appointments with K.T. Misty testified the play therapist put K.T. on "a very strict program that if you don't follow through and do it in both households, it can disrupt" him. Misty believes K.T. is becoming confused because he does not have the same rules in Nicholas's household. One suggestion from the play therapist was for each child to have one-on-one time with the parents. Misty follows that suggestion with the help of a friend.

Prior to trial, the parties stipulated to the resolution of the division of their assets and debts, and the court incorporated the stipulation into the decree. At the time of trial, Misty had accepted a job with American Gothic Home Association. She will be providing in-home care for eight dollars per hour, generally working Monday through Friday from 8:00 a.m. to 1:00 p.m. Misty stated her weekly hours will vary from twelve to twenty-five hours per week. Misty's schedule will allow her to take the children to and from school and to their numerous appointments. On cross-examination, Misty agreed she is underemployed and also agreed she is capable of earning a full-time minimum wage.[5] The court's ruling on child support was based upon Misty being employed full-time.

---

[5] Misty had consistently been employed through 2014 until she was injured at Work Force (material handler for one and one-half months until she broke a rib). Her previous jobs were through Manpower (at Vermeer—two months, September 2014 to early November 2014), ASI (painted windows at Pella Corp.—five months, April 2014 to August 2014), Temp Associates (sand molds for Bender's—three months, January 2014 to March 2014), Menard's (two years ending December 2013), and working at her own

Nicholas testified he is taking a new job with Mahaska Bottling in Oskaloosa with a full-time, annual salary of $39,140 for driving a vending-machine route Monday through Friday from 6:00 a.m. until his job is done—between 2:00 and 5:30 p.m. each day. Nicholas had arranged for the necessary babysitting, a sitter who allows children to be dropped off at 5:30 a.m. This job provides Nicholas with health insurance.

Nicholas testified he has little difficulty in having K.T. wear his CIs consistently and K.T. wears them during all waking hours, allowing K.T. to get the most out of the CIs. Nicholas admitted K.T. has had behavioral issues and attempted, though rarely, to take his CIs off at Nicholas's house. Nicholas has gone to school to help K.T. calm down, and the CIs have been broken at school. When parts for the CI break at Nicholas's house, he has backup parts. On cross-examination, Nicholas admitted he has not given Misty backup parts because "of the way some parts are getting broken constantly at her house."

> Q. Do you think it's important Misty have access to [backup parts]? A. There's been times when she's gotten ahold of me and I've gotten them to her.
> Q. Do you think it's important that [K.T.] have access to those parts? A. If all the parts are broken, how can he use them? If they are constantly getting parts for two of them broken, or three, then he doesn't have that access anyway.
> Q. You're not accusing Misty of breaking those parts are you? A. No.

If Nicholas needed to order replacement parts, he stated the parts usually arrive in two days.

beauty salon (almost one year). At some point Misty began receiving $659 per month in supplemental security income (SSI) payments for K.T. It appears Misty and the children lived on these payments from January 2015 through trial in early April 2015.

Misty testified she understands it is important for K.T. to wear the CIs and she appropriately takes them off *after* "he's having attitude" to prevent him from breaking parts. Misty first tries to redirect K.T., when that doesn't work *then* the CIs come off. "And working with [the play therapist], she's been helping me get other ways of redirecting him so we're not getting the CIs off right away." Misty believes one hour is the maximum amount of time K.T. has the CIs off for an attitude problem at her residence, and "most of the time," he goes only fifteen to twenty minutes without the CIs.

According to Misty, K.T. routinely wears his CIs at her house and she does whatever is possible to make sure he wears them. Misty believes the better choice when K.T. is "having attitude" is for her to remove the CIs for a short time to prevent him from breaking a part that would take time to replace and would render K.T. unable to hear during the wait. Misty explained she does not remove the CIs as a punishment and removing the CIs does not take away K.T.'s ability to communicate because "he can still sign." Also, Misty does not always take off the CIs when K.T. is angry: "I've placed him on my lap and sit there working through anger and attitude with his CIs on." But, Misty admitted she sometimes has a difficult time having K.T. put on his CIs. She also admitted his routine when he sees her after being dropped off by his father is to take off his CIs and hand them to her "but they end up back on him." Misty stated K.T. has his CIs on at home before they head to school in the car, a fifteen to twenty minute drive, and she described her routine:

> [He] doesn't like to wear the CIs in the car because he will chuck them up to the front window in the car when I'm driving. So

> as opposed to him throwing his CIs while I'm driving and losing the pieces in the car driving to school, I don't put them on him in the car so he doesn't get that chance to throw them to lose pieces in the car.
>
> I'll put them on him in school, and the last [IEP] meeting we had about his behavior, Kathy Utterback [AEA social worker] said why don't you give them to [K.T.'s one-on-one aide] and we'll take care of it here at school.

Teacher Welch testified the discussion at the meeting was to try to alleviate the struggle at school to get him to put on the CIs. "And it was brought up to whoever's house he came from, to make sure that he had them on when he came to school." Welch recalled Misty stating she "would put them on in the morning and he would take them off in the car, so she would just put them in his bag." Welch testified the school was okay with Misty's plan because we "can't say you have to put them on. It was just a suggestion to try to alleviate some of the behaviors." Welch also testified her own practice is also not to force K.T. to put on the CIs if he does not want to wear them.

Kathy Utterback, the school social worker from the AEA, testified K.T. "interacts pretty well" in the classroom, he is "comfortable there," and he participates. She believes there have been more concerns this year with K.T. following the rules, stating: "When he has the [CIs on,] he just has better access to what is going on around in his environment so he hears and follows the rules better." Utterback's contact with Misty and Nicholas has been at the annual IEP meetings, and she observed both parents have always been present and participating appropriately. According to Utterback, at the February 2015 meeting, everyone agreed K.T.'s days went better if he arrived at school wearing the CIs. Additionally:

Q. And isn't it correct that you told her [at the meeting] to put the CIs in the bag and bring them to school? A. Uh-huh. We told her, we talked about it that it's not worth fighting over and we don't fight with him at school with that either.

Q. You don't fight with him about wearing the CIs? A. No, because that typically turns into kicking, hitting, running around the room. And so, we talked about it's better to have them in the classroom and at least getting information than having those kinds of experiences.

At trial, Misty stated she thought it was important for the children to have a relationship with their father but she can provide more consistency and stability. Specifically, "I've raised the kids, taken care of them. I get the kids to their appointments on time. I make sure that they are taken care of." Nicholas believed he should have physical care because, among other reasons, he is more successful in having K.T. wear his CIs throughout the day.

The guardian-ad-litem's April 2015 report stated H.T. "is a lively and engaging nine year old, currently in third grade." She enjoys playing softball, and her dad helps out as a coach. H.T. "didn't identify anything at either house that made her unhappy." The report concluded: "These are two wonderful children who appear to have good family and community support. Hopefully the parties can continue to provide supportive environments."

The district court found both parents can provide for the children's "respective needs to enable them to thrive" and "Misty has been and continues to be the primary caregiver." The court also concluded, while Nicholas "is somewhat better qualified, situated, or motivated to deal with K.T.'s special needs arising from his deafness," the "evidence also establishes that both parties are capable of accomplishing that goal and are motivated to do so." The court

found Nicholas's testimony to be "somewhat more credible" than Misty's testimony, but thereafter specifically found its credibility determination "does not significantly diminish either party's ability to care for the two children going forward."

The court concluded physical care should remain with Misty, due to (a) Misty having been the primary caregiver "during most of their lives"; (b) despite Nicholas being "somewhat better situated to care for [K.T.], both parties are able and willing to care for K.T., including his special needs"; (c) the fact Nicholas's work hours begin at 6:00 a.m. and continue to an indefinite time in the afternoon "will create issues concerning the care and supervision of the children;" and (d) "although a close question, the best interests of the children will be served by the placement of their physical care with Misty."

Nicholas now appeals, claiming the court should have awarded him physical care. Misty cross-appeals.

## II. Standard of Review

We review the district court's decision de novo. *In re Marriage of McKenzie*, 709 N.W.2d 528, 531 (Iowa 2006). We examine the entire record and decide anew the legal and factual issues properly presented. *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). "However, we recognize that the district court was able to listen to and observe the parties and witnesses." *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). Consequently, we give weight to the district court's findings of fact, especially when considering

the credibility of witnesses, but we are not bound by them. *In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009).

## III. Physical Care

Nicholas requests we reverse the district court and grant him physical care of the children. Physical care is the right and responsibility to maintain a home for the children and provide for the routine care of the children. *In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). "When considering the issue of physical care," the children's best interests are "the overriding consideration." *Id.* (recognizing the district court's opportunity to observe the witnesses). The ultimate objective is to place the children in the environment most likely to bring them to healthy physical, mental, and social maturity. *In re Marriage of Hansen*, 733 N.W.2d 683, 696–99 (Iowa 2007).

Misty is correct in asserting we give consideration to placing children with the historical caregiver. *See In re Marriage of Decker*, 666 N.W.2d 175, 178–80 (Iowa Ct. App. 2003). However, Nicolas is correct that "no one criterion is determinative" and our courts apply a multi-factored test. *Hansen*, 733 N.W.2d at 697. The "fact a parent was the primary caretaker prior to separation does not assure [she] will be the custodial parent." *Decker*, 666 N.W.2d at 178.

As the district court recognized, Misty and Nicolas are both competent and loving parents who are sincere and motivated in their desire to care for their children. Each parent would be a suitable caretaker for the children since each has shown in the past the love and nurturing the children need. Thus, the choice

of physical care in this case necessarily turns on narrow and limited grounds. In such cases, "stability and continuity of caregiving are important factors" and "preservation of the greatest amount of stability possible is a desirable goal." *Hansen*, 733 N.W.2d at 696–97. These factors favor a parent who was primarily responsible for the physical care of the minor children. *Id.* After our de novo review, we agree with the district court's conclusion Misty was the primary caregiver for the children. Although Nicholas disputes this finding, claiming he shared equally in physical care, we defer to the district court, recognizing its opportunity to observe the parties in reaching its conclusion. Accordingly, the concepts of continuity, stability, and approximation do not support this court changing physical care to Nicholas; physical care to him is not an alternative "least disruptive to the children." *See id.* at 700.

On our de novo review, we also concur in the district court's decision to place the children in Misty's physical care. While we review de novo, we defer to the district court's fact findings and credibility assessments. *Gensley*, 777 N.W.2d at 713. Specifically:

> A trial court deciding dissolution cases is greatly helped in making a wise decision about the parties by listening to them and watching them in person. In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented.

*In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (internal quotation marks omitted). In making its physical-care determination, the district court considered the appropriate factors and provided a well-reasoned explanation. Because the court had the opportunity to observe the parties and witnesses and

concluded it was in the children's best interests to grant physical care to Misty, we decline to reverse that judgment and affirm on the issue of physical care.

## IV. Dependency Exemptions for Income Tax

Nicholas took H.T. as a tax exemption for 2014, and Misty took K.T. At trial, both parties sought to have the tax exemptions similarly divided. However, the district court sua sponte awarded the dependency exemptions for both children to Nicholas. In a post-trial motion, Misty asked the court to revise this determination, and the court declined, ruling: "Nicholas has had full-time employment for many years and continues with full-time employment. In addition, Misty has not established a consistent history of full-time gainful employment. Nicholas will benefit significantly more from the tax dependency exemption than will Misty."

On cross-appeal, Misty seeks one of the dependency exemptions, claiming her need for this exemption is greater than Nicholas's need due to her annual earnings of $10,400. Misty also claims the court's ruling is inequitable.

We first note Misty testified her hours *would vary* from twelve to twenty-five hours per week. Only if Misty worked twenty-five hour weeks for all fifty-two weeks in the year would she would earn $10,400. Nevertheless, based on the facts (1) Misty is entering a new position without historical earnings, (2) Misty may likely be able to benefit from the dependency exemption or special tax credits, and (3) Nicolas asked the court to split the dependency exemptions and allocate one to each parent, we modify the district court's ruling and grant one

exemption to each party as was done in the 2014 tax year—Nicholas shall claim H.T. and Misty shall claim K.T. The parties will alternate this exemption on a yearly basis when one child remains a dependent as long as child support is current. If it turns out Misty's future earnings demonstrate she will not benefit from the exemption, Nicholas may apply to modify this provision.

**V. Deduction of K.T.'s SSI Benefits from Nicholas's Child Support**

The court ordered Nicholas to pay Misty $750 per month in child support. The court also ruled: "As long as Misty is receiving SSI benefits for the child K.T., those benefits shall offset the amount of child support owed by Nick to Misty for the child K.T." Accordingly, the court ordered Nicholas's child support "reduced by the sum of $659 per month," i.e., support of ninety-one dollars per month.

On appeal, Misty challenges this offset, claiming the court's ruling provides "little to no explanation as to the reason" for the SSI offset. We agree with Misty; the court did not provide a rationale or analysis for the offset and did not cite any statutory or case authority supporting the offset.

This court has discussed the interplay between SSI payments and child support. *See In re Marriage of Benson*, 495 N.W.2d 777, 781-82 (Iowa Ct. App. 1992). We found SSI is "public assistance" and recognized payments for public assistance are not included as income under the child support guidelines. *See id.* at 781 (declining to include the children's SSI payments as income for the mother "because we consider [SSI] as public assistance . . . and also because we recognize the amount of [SSI] received, if any, will be affected by the child support that [the father] is ordered to pay"). We concluded:

> [SSI] is based on need and anticipates that it will only come into play if minor children do not have sufficient support from their parents. We will not structure child support so as to make families eligible for [SSI]. Eligibility for [SSI] should be determined after the courts have fixed reasonable child support based on the noncustodial parent's ability to pay.

*Id.* at 782. *See, e.g., In re Marriage of Keim*, No. 04-0034, 2004 WL 2674274, at *2 (Iowa Ct. App. Nov. 24, 2004) (recognizing "Iowa Court Rule 9.5, of the Child Support Guidelines, states that, 'Gross monthly income does not include public assistance payments'" and rejecting father's claim the SSI payments received by mother and son should have been included in mother's income for purposes of calculating child support).

Accordingly, under the circumstances of this case, we modify the dissolution decree to strike the provision giving Nicholas "a credit to" his child support obligation based on SSI payments attributable to K.T. of $659 per month. We affirm the court's determination Nicholas should pay child support of $750 per month.

## VI. Appellate Attorney Fees

Misty requests attorney fees for this appeal.[6] We have discretion in awarding appellate attorney fees. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). "We consider the needs of the party making the request, the ability of the other party to pay," and the relative merits of the appeal. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). Misty successfully

---

[6] We do not address Misty's conclusory request that we should award her trial attorney fees. *See Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) (holding random mention of an issue, without analysis, argument, or supporting authority is insufficient to prompt an appellate court's consideration).

defended the decision of the district court. Her imputed yearly income is considerably lower than Nicholas's annual income. Additionally, Misty was successful on her cross-appeal. Accordingly, we conclude Nicholas should pay $750 toward Misty's appellate attorney fees. Costs of this appeal are taxed to Nicholas.

**AFFIRMED ON APPEAL; MODIFIED ON CROSS-APPEAL.**