# IN THE COURT OF APPEALS OF IOWA

No. 15-1405
Filed August 31, 2016

IN RE THE MARRIAGE OF ANDREW J. CUMMER
AND KITTY H. CUMMER

Upon the Petition of
**ANDREW J. CUMMER,**
        Petitioner-Appellant,

**And Concerning**
**KITTY H. CUMMER,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Delaware County, Michael J. Shubatt, Judge.

Andrew John Cummer appeals the physical-care provision of the decree dissolving his marriage to Kitty H. Cummer. **AFFIRMED.**

Dan J. McClean of McClean & Heavens Law Offices, Dyersville, for appellant.

Jenny L. Weiss of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Andrew John Cummer appeals the physical-care provision of the decree dissolving his marriage to Kitty H. Cummer. We affirm.

## I.      Background Facts and Proceedings

The parties first started dating in March 2013. Kitty discovered she was pregnant seven weeks later. The parties broke off the relationship shortly thereafter, and the parties got back together and split up again a number of times during the pregnancy. In February 2014, the parties' minor child, R.P., was born.

When R.P. was approximately two weeks old, Andrew filed a custody action. A temporary visitation order was entered, awarding Andrew supervised visitation at Kitty's home. While exercising this visitation, Andrew and Kitty rekindled their relationship, and the parties wed in July 2014. The parties separated a few months later. In October 2014, Andrew filed a petition for dissolution of marriage. Kitty has at all times been the primary caregiver to R.P.

At the time of trial, Andrew lived in a four-bedroom home in which he had recently completed some home-improvement efforts. Andrew works forty to forty-five hours a week as a manager at a grocery store making $18.50 an hour. Kitty lived in a one-bedroom apartment. Kitty has a GED, some secondary schooling, and has studied sign language. Kitty indicated she wanted to go back to school and ultimately teach sign language, although at the time of trial, she was a stay-at-home mother receiving social security disability benefits for her bipolar condition, for which she takes medication under a physician's supervision.

At the time of trial, the minor child was approximately fifteen months old. The parties and various third-parties confirmed R.P. is a happy baby reaching his developmental milestones, although he was born without enamel on his teeth.

Since R.P.'s birth, Kitty has engaged in a number of services through which she receives support in caring for R.P. An in-home parent educator for Regional Medical Center, who had known Kitty in her official capacity for approximately a year, testified Kitty had requested the assistance of and voluntarily participated in a parenting-assistance program. The parent educator, who sees Kitty every two weeks, described Kitty as "hands on," "very loving," and engaged in learning about R.P.'s development. She testified Kitty is aware of her weaknesses as a parent and that she has no concerns about R.P. being in Kitty's care. She testified R.P. was developmentally on target and a very happy child. She also testified she was aware Kitty was bipolar but has no concerns about Kitty's mental illness in relation to Kitty's ability to take care of R.P.

A social worker testified regarding Kitty's involvement in a play group, called a Mom and Me class, through a local hospital. She testified she sees Kitty on a monthly basis with R.P. at the class and that R.P. is happy and developing normally. She described Kitty as an attentive and caring mother.

Kitty's doula also testified, stating that since R.P.'s birth she has seen Kitty with R.P. at the Mommy and Me classes. She indicated she saw no concerns in R.P.'s development, saw a strong bond between the child and Kitty, and had no concerns for Kitty as a mother.

Kitty voiced concerns at trial about Andrew's ability to properly care for R.P. She indicated Andrew originally failed to properly secure R.P. in a car seat

or properly secure the car seat to the car, Andrew has repeatedly put R.P. in diapers a size too small, and R.P. has been returned to her home at least four times with a diaper rash. She also indicated Andrew has failed to communicate with her about what he is feeding R.P. and failed to provide that information to R.P.'s doctor despite indicating he would. Kitty also expressed concerns about the condition of Andrew's home, stating there is a constant flow of people in and out of the home and identifying numerous safety concerns including holes in the wall and flooring, torn carpet, and exposed plaster.

In response to Kitty's concerns, Andrew testified he had his home inspected by a registered nurse and a social services worker. He also testified to his concerns about Kitty's feeding of R.P., primarily regarding Kitty's continued breastfeeding of the child.

Much of the testimony at trial revolved around the parties' respective past relationships. The record supports that Kitty has a history of domestic violence in past relationships. The record further supports that Andrew has a contentious relationship with his ex-wife, and multiple witnesses testified Andrew puts his children in the middle of disputes he has with his ex-wife. The district court found, however, and the record supports, that there was no credible history of domestic abuse between the parties themselves.

A considerable portion of the testimony at trial also pertained to the parties' respective children from past relationships. The district court found and the record supports that Andrew's children with his ex-wife have generally had a hot and cold relationship with their parents, moving between the two households based upon their living preferences at the time. The record indicates Andrew has

been physical with his children in the past. Andrew admitted there was a founded Iowa Department of Human Services report for a bruise he put on his daughter. He also admitted to having "tapped" his daughter in the mouth and then putting his daughter's personal items on the lawn, an incident that ultimately involved the police. He also admitting to "tapping" his son in the mouth. Similarly, the record indicates Kitty has had an equally inconsistent relationship with her adult children, one of whom has a history of drug-addiction issues. All of the children who testified, however, stated they had good relationships with their respective parents who are parties to this matter and that they believed R.P. should be with their respective parent.

The record also evidences the parties have poor communication. The district court found their communication bordered on toxic. Despite this, Kitty has taken R.P. to visit some of Andrew's other children in order to maintain R.P.'s relationship with his half-siblings.

At trial, Andrew requested sole legal custody and physical care of the child, or, in the alternative, shared care. Kitty requested joint legal custody and physical care. She also expressed her desire to relocate with R.P. to South Carolina to be with her family.

Kitty is originally from South Carolina, where her family still lives, including her father, step-mother, uncles, aunts, stepbrothers, cousins, grandmother, and grandfather. She indicated she would move in with her grandparents, who have a three-bedroom ranch home, and hoped to get a job as a sign language translator at the college where her father works, although she indicated she intended to stay home to care for R.P. in the more immediate future.

Trial was held on this matter in May 2015. In its decree, the district court granted joint legal custody to the parties, physical care to Kitty, and visitation to Andrew, accounting for the fact that Kitty might relocate to South Carolina with the child.

## II.     Scope and Standard of Review

We review dissolution cases, which are tried in equity, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483-84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend upon the facts of the particular case." *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

## III.    Analysis

### A.    Physical Care

Where child custody and physical care are at issue in a marriage dissolution case, the primary consideration is the best interests of the child. Iowa R. App. P. 6.904(3)(o). We look to the factors listed in Iowa Code section 598.41(3): (1) whether each parent would be a suitable custodian for the child; (2) whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents; (3) whether the parents can communicate with each other regarding the child's needs; (4) whether both parents have actively cared for the child before and since the separation; (5) whether each parent can support the other parent's relationship with the child; (6) whether the custody arrangement is in accord with

the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity; (7) whether one or both parents agree or are opposed to joint custody; (8) the geographic proximity of the parents; (9) whether the safety of the child, other children, or other parent will be jeopardized; (9) whether a history of domestic violence exists; and (10) whether either parent has allowed a sex offender access to the child. We also look at the factors announced in *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974):

> (1) The characteristics of each child, including age, maturity, mental and physical health.
> (2) The emotional, social, moral, material, and educational needs of the child.
> (3) The characteristics of each parent, including age, character, stability, mental and physical health.
> (4) The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
> (5) The interpersonal relationship between the child and each parent.
> (6) The interpersonal relationship between the child and its siblings.
> (7) The effect on the child of continuing or disrupting an existing custodial status.
> (8) The nature of each proposed environment, including its stability and wholesomeness.
> (9) The preference of the child, if the child is of sufficient age and maturity.
> (10) The report and recommendation of the attorney for the child or other independent investigator.
> (11) Available alternatives.
> (12) Any other relevant matter the evidence in a particular case may disclose.

Also relevant to this decision are the factors of continuity, stability, communication, and approximation. *See In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Not all factors are given equal consideration, and the weight assigned to each factor depends on the specific facts and circumstances

of each case. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998).

Andrew argues he should have physical care of the parties' child because Kitty does not encourage his relationship with the child and he can provide a more appropriate living situation for the child. As an initial matter, there is no evidence in the record that Kitty's home is unsuitable. Though small, nothing indicates the home is incapable of meeting the child's needs. The only evidence regarding Kitty's home is contrary to Andrew's assertions on appeal. Further, at the time of trial, Kitty testified she was remaining in the apartment only until she was told by the district court whether she could move with R.P. to South Carolina, at which point in time, regardless of the answer, she intended to find different housing. We are cognizant Andrew made significant improvements to his home leading up to trial. Ultimately, the record reflects both parents are capable of providing suitable living accommodations.

As to Andrew's other argument, the record supports that the parties have issues communicating, but those issues are mutual. *See In re Marriage of Clark*, No. 12-2192, 2013 WL 3291834, at *4 (Iowa Ct. App. June 26, 2013) ("A significant factor in the physical care determination is the ability of each parent to communicate effectively with the other about the needs of their children."). Kitty blocked Andrew's ability to communicate with her by text; knowing this, Andrew continued to attempt to communicate with her by text anyway. Kitty delayed granting Andrew access to R.P.'s medical records; Andrew failed to inform Kitty or the child's doctor of the foods he was feeding R.P., despite indicating he would do so. Andrew told Kitty she was the last person he would call if R.P. were

crying or upset. There is no evidence in the record that Andrew is any more willing to encourage R.P.'s relationship with Kitty than Kitty has encouraged R.P.'s relationship with Andrew.[1]

Ultimately, however, this court must determine what is in the best interests of R.P.[2] The record establishes Kitty has been the primary caregiver to the child. *See Hansen*, 733 N.W.2d at 697 (noting "the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution"). A social worker, Kitty's doula, and a parent teacher all testified Kitty is a loving and attentive mother, R.P. is bonded to Kitty, and R.P is a happy child meeting all of his developmental milestones. *See id.* ("[S]uccessful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality."). The parent teacher testified Kitty is aware of her shortcomings as a parent and seeks help and support for those areas. Further, Kitty has encouraged and facilitated R.P.'s relationship with his half-siblings from Andrew's past marriage. *See Winter*, 223 N.W.2d at 166 (noting a factor to consider was "[t]he interpersonal relationship between the child and its siblings").

Andrew also contends this court should disallow Kitty to move to South Carolina with the child. He asserts this move will only frustrate and deteriorate his relationship with R.P., Kitty has no legitimate reason to want to move to South

---

[1] This is further demonstrated by the fact that, after trial but before the court entered its decree, Kitty requested the opportunity to take R.P. to South Carolina to visit her grandmother, who had fallen ill. Andrew refused. Kitty filed a motion pursuant to Iowa Rule of Civil Procedure 1.904 seeking leave to visit South Carolina with her son—a trip that would interfere with one day of visitation for Andrew. Andrew resisted. Eventually, Andrew withdrew his resistance and the request was granted.

[2] At trial, Andrew requested sole legal custody of R.P. or, in the alternative, joint physical care of R.P with Kitty. Andrew does not appeal the district court's denial of these requests.

Carolina, and it is in R.P.'s best interests that the State of Iowa retain jurisdiction over the child because of Kitty's mental illness and various allegations that Kitty experienced abuse in the past.

In *In re Marriage of Vrban*, the Iowa Supreme Court affirmed the district court's decision granting the mother physical care where the mother intended to move the children to a different state, noting "that stability in the lives of young children can be nurtured as much by leaving them with the person who has been their primary parent figures as by requiring them to live in a neighborhood from which that person has moved." 359 N.W.2d 420, 425 (Iowa 1984). The court noted the mother had planned for the move, testified openly about her plans at trial, and awaited the court's custody determination before making the move. *Id.*

Similarly, here, Kitty expressed her plans to move back to South Carolina to be near her extended family, to move in with her grandparents until she could find suitable accommodations for herself and R.P., and her intention to eventually secure work—with the assistance of her father—as a sign language interpreter. She indicated this move was necessary because there are few job opportunities in her current community, few child care options, and she lacks family support in Iowa—beyond her adult son whose future plans are undetermined. There is no indication in the record that Kitty desires to move simply to interfere with Andrew's contact with R.P. *See In re Marriage of Jerome*, 378 N.W.2d 302, 305 (Iowa Ct. App. 1985) (recognizing "how mobile our society is" and how Iowa courts "have been reluctant to limit a custodial parent to a geographic area where there is evidence that the custodial parent has valid economic reasons for moving and the move is not predicated on an attempt to limit visitation of the

noncustodial parent"). She also waited until the court had made its determination before moving R.P.

The district court expressed concerns about designating either Kitty or Andrew as physical-care provider, but determined it was in R.P.'s best interests to be placed with Kitty because "she will be better able to provide R.P. with a peaceful home setting that addresses R.P.'s physical, mental, and emotional needs." On our de novo review, we agree. Accordingly, we affirm the district court's grant of physical care to Kitty.

### B. Attorney Fees

Kitty requests not less than $5250.00 in appellate attorney fees. Appellate attorney fees are not a matter of right, but rather rest in this court's sole discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In determining whether to award attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* Having considered these factors, we determine Andrew shall pay $2500 of Kitty's appellate attorney fees. Costs shall be assessed one-half to each party.

**AFFIRMED.**