# IN THE COURT OF APPEALS OF IOWA

No. 20-1703
Filed February 16, 2022

IN RE THE MARRIAGE OF CORINA JEAN SHIPP
AND REGINALD STEVEN SHIPP

Upon the Petition of
CORINA JEAN SHIPP,
        Petitioner-Appellant,

And Concerning
REGINALD STEVEN SHIPP,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Des Moines County, Mark Kruse,

Judge.

        Corina Shipp appeals the physical care provisions of a dissolution decree.

**AFFIRMED.**

        Andrew B. Howie and James R. Hinchliff of Shindler, Anderson, Goplerud

& Weese, P.C., West Des Moines, for appellant.

        Reginald Steven Shipp, Iowa City, self-represented appellee.

        Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**MAY, Judge.**

Corina and Reginald ("Reggie") Shipp have one daughter, C.L.S., who was born in 2013. In 2019, Corina commenced this dissolution action. Corina and Reggie represented themselves at trial. The district court granted joint legal custody but placed C.L.S. in Reggie's physical care. On appeal, Corina asks us to switch physical care to her.[1] We affirm.

In dissolution proceedings, our review is de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). But we give weight to the fact findings of the trial court, who is "greatly helped in making a wise decision about the parties by listening to them and watching them in person." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (citation omitted). We will affirm unless the district court "failed to do substantial equity." *See Boatwright v. Lydolph*, No. 18-0532, 2019 WL 719026, at *1 (Iowa Ct. App. Feb. 20, 2019) (citation omitted).

Neither party requests joint physical care and, in any event, we agree with the district court that joint care would not be in the child's best interest. *See* Iowa Code § 598.41(5)(a) (2019). So our task is to determine which physical care placement—with Reggie or with Corina—is in C.L.S.'s "best interest." *Id.* § 598.41(3). In making this decision, we consider a broad range of factors. *Id.* (setting forth relevant factors); *In re Marriage of Winter*, 223 N.W.2d 165, 166-67

---

[1] In her reply brief, Corina asks us to disregard Reggie's appellate brief for not complying with the Iowa Rules of Appellate Procedure. We expect both represented and non-represented litigants to adhere to our procedural rules. *In re Estate of DeTar*, 572 N.W.2d 178, 180 (Iowa Ct. App. 1997). We agree with Corina that Reggie's brief does not approach substantial compliance with the rules. For instance, although Reggie makes numerous factual assertions, he fails to cite to the record in violation of Iowa Rules of Appellate Procedure 6.903(3) and 6.904(4). So we grant Corina's request and do not consider Reggie's brief.

(Iowa 1974) (discussing same). Our goal "is to place the child[] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683,695 (Iowa 2007). We pursue "stability and continuity with an eye toward providing the child[] with the best environment possible for their continued development and growth." *Id.* at 700. But of course the child's safety comes first. *See, e.g.*, *In re Marriage of Oswalt-Weiler*, No. 18-1899, 2019 WL 3317345, at *2 (Iowa Ct. App. July 24, 2019) ("We agree with the district court that requiring professional supervision at all visitations is an appropriate remedy. It will enhance the children's safety and, therefore, advance their best interests.").

Following our de novo review, with appropriate deference to the district judge who has seen and heard the parties in person, we conclude placement with Reggie is in C.L.S.'s best interest. Like the district court, we think either parent could be a capable caregiver *under the right circumstances*. As the district court found, both are "well-educated, intelligent, and well-spoken." Both "hold positions of significant responsibility" in education that "require positive interactions with people of different backgrounds and ages, in particular, young people." "Both are able to meet the daily needs of their daughter." And both parents "treasure their daughter."

At the same time, there are reasons for concern about each parent. They have engaged in domestic violence with each other. Like the district court, we think they share blame for this. Also, both parties have used terrible language toward one another.

In many ways, then, the parents seem like equivalent candidates to serve as C.L.S's physical caregiver. But two considerations distinguish them. The first is which parent has historically been C.L.S.'s main caregiver. While Reggie has provided some of the child's basic care, Corina has provided most of it. And since the separation, Reggie has missed many visitations without a clear excuse. Further, although C.L.S. has historically attended school in Burlington where Corina lives, Reggie has now moved to Iowa City. So placing C.L.S. with Reggie requires a change in schools. All things considered, then, we agree with Corina that the historical caregiving arrangement points towards placing physical care with her.[2] And as the district court properly acknowledged, this factor is important when determining which parent should have physical care. *See Hansen*, 733 N.W.2d at 700 (noting "the factors of continuity, stability, and approximation are entitled to considerable weight" when deciding "which caregiver should be awarded physical care").

But other important concerns weigh against placement with Corina. *Cf. id.* at 697 (noting "[t]here may be circumstances, of course, that outweigh considerations of stability, continuity, and approximation" when determining whether joint physical care is appropriate). Like the district court, we are particularly concerned with Corina's relationship with a person who goes by the street name "D." The record shows that D plays a significant role in an organization

---

[2] We also note that when C.L.S. spends time with Corina, she can also spend time with Corina's son, C.L.S.'s half-brother. *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986).

that traffics large quantities of narcotics and employs lethal violence.[3] By way of example, the record shows that D's brother, who is also involved in the organization, confessed to a 2019 murder. The victim suffered six bullet wounds, two in the back of the head. The murder occurred at a residence where law enforcement agents recovered "approximately 11 pounds of methamphetamine" plus "indicia or paperwork with [D's] name on it." D's brother called D immediately after the killing. Corina was with D when he received the call. Corina has been called as a prosecution witness to testify about the phone call.

In her appellate brief, though, Corina minimizes her relationship with D and claims it has no relevance to the physical-care issue. Yet, Corina has acknowledged that—prior to his incarceration—D spent the night at her home "most nights." And, Corina testified, D "was a father figure for" her children. According to Corina, her children "adore him, respect him. He made [Corina and her children] smile again." Corina also testified that C.L.S. "wished" that D was "her dad."

Even so, Corina suggests, she and her children are separated from D's criminal activities. For instance, she testified that, "even though [D] did commit that crime of trafficking drugs," she "never saw drugs" and there "weren't drugs

---

[3] We have relied, in part, on a transcript from a federal criminal proceeding. At the trial in this dissolution case, the transcript was admitted without objection. Even so, we have considered Corina's point—which she raises for the first time on appeal—that the transcript includes layers of hearsay. All things considered, we believe the transcript is sufficiently reliable to serve as support for the findings contained in this opinion. "When evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of its rational persuasive power." *In re Marriage of Schneckloth*, 320 N.W.2d 535, 538 (Iowa 1982).

around [her] children." But sometimes D's criminal activities directly impacted Corina's home. In November 2019, law enforcement agents executed a search warrant at a location they believed to be D's residence. Agents did not find D— but they did find D's mother. She told officers that D "was likely at his girlfriend Corina Shipp's residence." Based on their prior investigations of D, agents knew where Corina lived. Officers went to Corina's home and "set up around the residence." Agents "were present at" Corina's "residence for multiple hours trying to negotiate" D's surrender. Eventually, agents "utilized tactical deployments to clear" Corina's residence. They found a backdoor open—and concluded D had escaped before their entry.

But three days later, D surrendered to authorities. And now it appears D will serve between five and forty years on federal charges. So, Corina suggests, her relationship with D is just a "*past* relationship." But in her trial testimony, Corina said her "place in [D's] life *right now* is just to be a support for him." When asked if she "currently right now" visited D "in prison," she responded "yes" but clarified she actually visited D in Muscatine jail. When asked how often she went, she said "once or twice a week," "sometimes less," although she claimed she hadn't "been for a month or so." When asked how much money she puts on his books,[4] she claimed she hadn't put her *own money* on his books; rather, she claimed, she had "only put money his mom's given [her] to take up there." In any event, Corina

---

[4] "Putting money" on an inmate's "books" means depositing money in an account so the inmate can purchase commissary items or make phone calls while incarcerated.

admitted taking C.L.S. to the Muscatine County jail when she put money on D's books. But C.L.S. couldn't actually visit D. Rather, C.L.S. waited in the lobby.

Like the district court, we think these facts are deeply disturbing. They raise real worries about Corina's judgment. And they raise troubling questions about the safety of Corina's home. So, like the district court, we conclude C.L.S. should not be placed in Corina's care.

As already explained, we have not overlooked the substantial advantages of Corina's home, including her historical role as caregiver, her proximity to C.L.S.'s historical school, and the opportunity for C.L.S. to live with her half-sibling. With a different record, these advantages might well have led us to place C.L.S. with Corina. As explained, though, in light of the disturbing record evidence concerning D and his associates (not nearly all of which is repeated in this opinion), as well as Corina's continued relationship with D and his associates (e.g., putting D's mother's money on D's books), we cannot conclude that placement with Corina is in C.L.S.'s best interest.

**AFFIRMED.**