# IN THE COURT OF APPEALS OF IOWA

No. 25-0422
Filed December 17, 2025

IN RE THE MARRIAGE OF THEODORE CLARK
AND KARA CLARK

Upon the Petition of
THEODORE CLARK,
        Petitioner-Appellee,

And Concerning
KARA CLARK,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Christopher Kemp,

Judge.


        A woman appeals the district court's modification of the decree dissolving

the marriage between her and her former husband.  **AFFIRMED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        Jessica Shannon of Dentons Davis Brown PC, Des Moines, for appellee.


        Considered without oral argument by Ahlers, P.J., and Chicchelly and

Sandy, JJ.

**SANDY, Judge.**

Kara Clark appeals the district court's modification of the decree dissolving the marriage between her and Theodore (Ted) Clark. On appeal, Kara requests that she be given sole legal custody and physical care of the parties' children, that we remand to set Ted's visitation and support, and that appellate attorney fees and costs be assessed to Ted. We agree with the district court that "Ted is able to provide a more stable, consistent, and safe environment for the children. It is in the children's best interests that Ted be awarded primary physical care, subject to Kara's reasonable rights of visitation." We thus affirm. Each party shall be responsible for their own appellate attorney fees.

## I. Background Facts & Procedural Posture.

This appeal arises from a post-dissolution custody modification concerning the minor children of Ted and Kara following registration of their Kansas dissolution decree. The parties share two children in common: C.C., born in 2018, and R.C., born in 2020. The parties married in August 2017, and a September 2022 Kansas divorce decree awarded joint legal custody and shared physical care of the parties' children. It further ordered Ted to pay Kara $436 per month in child support, while affirming an $8,352 judgment for unpaid temporary support.

Soon thereafter, both parties relocated to Iowa. In November 2022, Ted registered the Kansas decree in Iowa and petitioned to modify the decree, seeking physical care as well as direction relating to the school district the children were to attend. Kara answered and counterclaimed, requesting physical care. She later filed a June 2023 contempt application concerning the $8,352 judgment and a $45,000 property settlement issued by the Kansas court. However, trial did not

occur. In July 2023, the parties stipulated to maintain joint legal custody and shared physical care while modifying the parenting schedule, engaging in co-parenting counseling, eliminating child support prospectively, splitting child-related expenses equally, and providing that Ted would pay Kara $350 monthly toward the $8,352 and $45,000 obligations until paid. The court adopted the stipulation in August and dismissed the contempt application.

However, within about five months the parties found themselves back before the court. In January 2024, Kara filed a domestic-abuse petition in Polk County, alleging threats made by Ted, and contemporaneously petitioned to modify the decree to seek physical care. Kara alleged a disputed incident at a Wal-Mart custody exchange had occurred that month. That incident involved a disagreement over R.C.'s antibiotics for strep throat. Kara reported that Ted threatened to kill her, used slurs, and came within inches of her while the children were present and upset. Ted later asserted Kara had weaponized the judicial system. The parties subsequently stipulated to a consent agreement requiring Ted to stay away and prohibiting direct communication except through a co-parenting app.

In February, the parties stipulated to temporary matters, maintaining joint legal custody and shared physical care while modifying the schedule and exchanges and appointing a social worker as an evaluator to conduct a custody evaluation. The court approved the temporary order and later formally appointed the evaluator in August with an expectation that Ted continue therapeutic services through the U.S. Department of Veterans Affairs (the "VA") and provide confirmation to the evaluator. After a May contempt hearing, the district court

found Ted in contempt for violating the protective order by going to C.C.'s school (Kara's workplace) to have a non-emergency conversation. The court imposed a thirty-day sentence with mittimus withheld, conditioned on compliance.

The custody modification trial occurred in December over the course of three days.[1] At that time C.C. was in first grade and R.C. attended daycare and was to start kindergarten in the fall 2025. Kara resided in Adel and worked approximately thirty-seven hours per week as an assistant teacher for prekindergarten and kindergarten at C.C.'s school. Ted lived in De Soto and received military disability following his 2017-2022 service in the Army.

The court heard testimony from the coparenting counselor. She described some of Ted's behavior and communications, specifically, past suicidal ideations (which she never contacted authorities about). Ted complied with addressing his mental health through the VA, but she still observed Ted to be very angry and reactive, including calling her thirty-two times when she was unavailable. She documented that Ted made negative statements about Kara to the children and questioned them about Kara's behavior.

Pursuant to the stipulation, the court-appointed evaluator conducted a custody evaluation via meetings, home visits, and review of materials. The evaluator described the relationship between Ted and Kara as extremely high conflict. She found Kara honest and engaged and assessed Ted as very negative, angry, and volatile toward Kara, with concerns about lack of insight, impulsivity, boundary violations, and enmeshment affecting the children. She recommended

---

[1] The parties stipulated to submit the issue of legal custody to the court.

that Kara have sole legal custody and physical care, opining that Kara was best suited as the primary legal decision-maker for the children's medical, educational, and extracurricular needs and that, if a single decision-maker was required, it should be Kara.

The district court received evidence about Kara's relationships, including prior involvement with S.D., who had a felony child-endangerment conviction, and frequent overnights by K.B. Testimony revealed that K.B. had an active Iowa Department of Health and Human Services investigation for sexual abuse of his own sons. The court found Kara did not inform Ted about these men's presence around the children. The parties also disputed medical decision-making, including Ted's denial or initial refusal of R.C.'s asthma diagnosis and treatment and Kara's resulting lack of trust in his medical capability.

On January 17, 2025, the court entered its modification order, finding that joint legal custody was no longer appropriate due to the parties' communication failures and concluding that Ted should have sole legal custody. The court also awarded Ted physical care and set Kara's visitation and child support obligations. The court denied each party's request for attorney fees. In its credibility findings, the court observed that Ted made no attempt to downplay his vitriol toward Kara and was unable to say anything positive about her, while nevertheless determining that he provided a more stable, consistent, and safe environment and that the opposite arrangement from the evaluator's recommendation was in the children's best interests.

The court found that Kara told people what they wanted to hear but kept important information from Ted and was less than forthcoming. For example, even

when confronted with messages showing Ted informed her about injuries she claimed he never disclosed, Kara testified that the details of his information were not sufficient—but never raised that complaint to Ted. She also brought the children to a new pediatrician, evidently without notifying Ted and over his objection.

The custody evaluator's thirty-eight-page report, admitted at trial, offered valuable insight into the family dynamics and recommended Kara as the sole legal custodian and physical caretaker with Ted having liberal access, while articulating concerns about Ted's lack of insight, volatility toward Kara, and boundary issues. Of note, the custody evaluator was not apprised of Kara's relationship with K.B. The coparenting counselor corroborated aspects of Ted's reactivity and contact patterns. The court weighed this against evidence concerning Kara's relationships with S.D. and K.B. and her nondisclosure to Ted, concluding those choices presented a significant risk to the children's physical health and wellbeing and supported its decision to place sole legal custody and physical care with Ted.

The decree included detailed provisions governing exchanges and communications in light of the no-contact order then in effect, directed exchanges occur at a public place with video recording, and specified that those directives would control over restrictions imposed in the domestic-abuse case for exchange purposes. The court ordered Kara to pay monthly child support of $597.63 for two children beginning in February 2025 (reducing to $399.11 when only one child was eligible), set medical support allocations with Ted paying the first $250 per child annually and then splitting uncovered expenses 51%/49% (Ted/Kara), allocated

tax dependency exemptions, and split custody evaluation costs equally while otherwise taxing court costs to Kara.

Kara filed a Rule 1.904(2) motion seeking reconsideration on several issues, including schedule adjustments, holidays, child support, and costs. On February 18, the district court granted the motion in part and denied it in part. The court changed Kara's mid-week overnight from Wednesday to Thursday due to animosity between the parents and exchange issues, and it denied her request for summer shared care based on concerns about the men she brought around the children and her secrecy regarding the same. The court noted the evaluator's view that frequent contact with both parents benefits the children and added "Beggar's Night" to the holiday schedule with alternating years. It also corrected child support by adopting Kara's guidelines to set her monthly obligation at $526.78 for two children (reducing to $349.81 for one child) and clarified that any portion of the coparenting counselor's final invoice exceeding the retainer and not paid in advance of trial would be split equally while remaining court costs would be paid by Kara.

Kara filed a timely notice of appeal. On appeal, Kara requests that sole legal custody and physical care be given to her and that we remand to set Ted's visitation and support, as well as that appellate attorney fees and costs be assessed to Ted.

## II.     Standard of Review.

"Petitions to modify the physical care provisions of a divorce decree lie in equity," and we review de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). "We give weight to the findings of the district court, particularly

concerning the credibility of witnesses." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (citation omitted). We are only to disturb the district court's ruling when the ruling fails to do equity. *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021).

### III.    Analysis.

"To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of the evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change." *In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992). "The party seeking modification of a decree's custody provisions must also prove a superior ability to minister to the needs of the children." *Harris*, 877 N.W.2d at 440.

The parties do not dispute that a material and substantial change in circumstances has occurred since the decree so as to warrant modification. Both sides agree that the current arrangement is not workable and they are back in court for the third time in the last three years. Their efforts at utilizing a parenting coordinator and stipulating to adjustments have not solved their issues. We agree with the district court that it was "in the children's best interest to make a change with respect to legal custody, physical care and visitation, and the accompanying adjustment to child support pursuant to the guidelines." The parties are "no longer able to cooperate" in any meaningful sense. *In re Marriage of Rolek*, 555 N.W.2d 675, 677 (Iowa 1996). Thus, the only issue remaining is which party should have sole legal custody and physical care of the children.

**A. Legal Custody**

Joint custody arrangements between "parents who demonstrate they are able to put aside their differences for the sake of their child" should generally be maintained. *Harris*, 877 N.W.2d at 440. "On the other hand, modification is generally appropriate when shared custody provisions incorporated into the decree have not evolved as envisioned by either of the parties or the court or when the parents simply cannot cooperate or communicate in dealing with their children." *In re Marriage of Beasley*, No. 21-1986, 2022 WL 16985437, at *7 (Iowa Ct. App. Nov. 17, 2022) (cleaned up). As the parties both agree, the custody provisions of the decree contemplated their ability to maintain coparenting duties and responsibilities. Although the court was hopeful that the parties could cooperate in those matters affecting the best interests of their children, "it is now quite clear that this is not the case." *Id.* (cleaned up).

The district court summed it up well, stating:

> Because both parents are opposed to joint custody, the Court is required to examine the factors in section 598.41(3) and make a legal custody determination that is in the children's best interests. Doing so leads to the conclusion that joint legal custody is not appropriate in this case. The parents cannot effectively communicate with each other, and sadly still have not shown they can support the other parent's relationship with the children. While the acrimonious relationship has not yet led to a legal custody dispute that has prevented the children from getting their needs met, it is likely only a matter of time. The parents could not agree on where to enroll the oldest in school, and Ted ultimately acquiesced and moved closer to Kara so the children [could attend the same district].
>
> Kara and Ted both deeply mistrust the other, do not believe the other parent communicates about the children as they should, and feel the other parent does whatever they want. The need for one parent to have sole legal custody is most evident by the fact that they unfathomably take the children to two different pediatricians:

Ted continues to take the children to the provider that they first selected when they moved to Iowa even though that doctor is in Pleasant Hill, and Kara takes the children to a provider closer to her home. As the statutory definition of joint custody currently mandates "an all-or-nothing proposition that 'leaves no room for a parceling of rights,'" the Court must determine which parent should have sole legal custody.

As a starter, we agree with the district court that "neither parent is without fault." But we defer to the credibility determinations of the court when it assessed both parties' candor in their testimony. We decline to recount and parse the parties' lengthy trial testimony in which they challenged nearly every aspect of the other's parenting capacities.

"[W]hen we say a case is reviewed de novo, this does not mean that we decide the case in a vacuum or approach it as though the trial court had never been involved." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (cleaned up). To the contrary, while not bound by the district court's findings, we give them weight and "defer especially where the credibility of witnesses is a factor in the outcome." *Id.* (cleaned up); *see also* Iowa R. App. P. 6.904(3)(g). Here, the district court, expressly considered Kara and Ted's credibility and made a decision after careful consideration of its observations of the parties' testimony. Indeed, those observations were an important factor in the outcome of the case because the district court explicitly told us they were.[2]

---

[2] The court noted: "The Court had the opportunity to observe the parents during their testimony. . . . The Court finds Ted is better suited to have sole legal custody . . . ."

We conclude Ted met his burden to show a substantial change in circumstances and a superior parenting ability, and we affirm the district court's decision to modify the legal-custody provisions of the parties' dissolution decree.

## B. Physical Care

Physical care determinations are not resolved based upon the perceived fairness to the spouses involved. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Rather, our primary consideration focuses on what is in the best interest of the child. *Id*. Ultimately, the objective of a physical-care determination is to put the children in the environment most likely to bring them to physical and mental health, and to social maturity. *Id*.

Or, as the district court aptly recited, "[d]etermining what custodial arrangement will best serve the long-range interest of a child frequently becomes a matter of choosing the least detrimental available alternative for safeguarding the child's growth and development." *In re Marriage of Winter*, 223 N.W.2d 165, 167 (Iowa 1974) (citing Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (The Free Press 1973)). The district court was faced with a difficult decision with no ideal option either way. Importantly, the trial court had "a front-row seat to the live testimony, viewing the demeanor of both the witness as [they] testifie[d] and the parties while they listen[ed], whereas our review is limited to reading black words on a white page of a sterile transcript." *Hora*, 5 N.W.3d at 645.

> Ted's inability to find fault in himself or adjust could hamper the children's emotional development. However, he does not do anything to endanger the children's physical wellbeing, and does what he believes is best for the children.
>
> Kara, on the other hand, while more polished, knows what people want to hear. Kara's family members talked about their

Christian values and Kara even noted that the family says their daily prayers when discussing her routine with the children. Kara's family did not seem to know about her exploration of spiritual practices such as paganism and earth centered beliefs. While her spiritual curiosity in and of itself is not a factor in her ability to parent, it is an example of how she says and shows one side of herself, and lives another. Most glaring and troubling example is her choice in relationships.

[The evaluator]'s report indicated Kara was engaging in therapy and making progress in addressing her relationship issues; this progress was likely based on self-report, and Kara did not disclose her relationship with [K.B.] to [the evaluator]. Even on the witness stand, Kara downplayed the relationship by saying they are friends exploring a relationship, despite having him consistently spend the night in her home, even while the children are present. Kara reports she has been working on unhealthy relationships after [S.D.], but then brought another man into her home and the children's lives with a concerning criminal history and pending allegations, and did not feel the need to mention that to Ted or anyone else. Her choices, lack of insight, and placing her own needs and desires over the best interests of the children poses a significant risk of not only emotional disruption for the children, but in the cases of these two men, presents a significant risk to the children's physical health and wellbeing.

We see no reason to disturb the district court's analysis. We give great weight to the district court's findings because the witnesses were before it and the district court was in a far better position to pass upon their credibility. *Davis-Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995). Unlike us, the trial court was "greatly helped in making a wise decision about the parties by listening to them and watching them in person." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (citation omitted).

The crux of Kara's argument on appeal asks us to weigh the negatives of Ted more heavily than the negatives of Kara. But that weighing is often best done by observation. And as an appellate court we are denied the impression created by the demeanor of each and every witness as the testimony was presented. *Id.*;

*see also In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974). We agree with the district court that "Ted is able to provide a more stable, consistent, and safe environment for the children. It is in the children's best interests that Ted be awarded primary physical care, subject to Kara's reasonable rights of visitation."

### C. Appellate Attorney Fees

"Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We hold that Ted and Kara shall each be responsible for their own appellate attorney fees.

**AFFIRMED.**